## SHAW v. UNITED STATES (No. 156).[1]

APPLICATION OF FAVORED-NATION CLAUSE TO TRADE CONVENTIONS.

By a convention of December 22, 1815, the terms of which, through subsequent agreements, remain in full force and effect, it was stipulated by and between the United States and His Britannic Majesty that "no higher or other duties shall be imposed on the importation into the United States of any article the growth, produce, or manufacture of His Britannic Majesty's territories in Europe * * * than are or shall be payable on the like articles being the growth, produce, or manufacture of any other foreign country." In pursuance of a provision contained in the tariff act of 1897, looking to the arrangement of commercial agreements in which reciprocal and equivalent concessions might be secured in favor of the products and manufactures of the United States, a commercial agreement between the United States and the Republic of France was negotiated and proclaimed June 1, 1898, in which it was reciprocally agreed that during the life of the agreement certain articles named therein should be admitted at designated rates on importation from one of the countries to the other. Among the articles so designated brandies or other spirits manufactured or distilled from grain or other materials were to be subject to a duty of $1.75 per gallon. The appellants subsequent to the date of this trade agreement with France imported into the United States from England certain whiskies and other spirituous liquors, and assert here that the favored-nation clause in the existing convention between this country and Great Britain, applies and that they are entitled to an allowance on their importation from England of the same rate of duty they would be entitled to if their importation had been brought in from France, namely, $1.75 per gallon. The goods were assessed at the port of New York at $2.25 per proof gallon, under paragraph 292, tariff act of 1897. Held, a reciprocity agreement is based on reciprocal considerations moving from each party thereto to the other, separate obligations being assumed in return for benefits granted; and other countries, not parties to the agreement, bearing in no sense the burden of the obligations, can not properly be taken to share in the accruing benefits. It would be, in the case at bar, to concede to Great Britain without a consideration what was conceded to France only on a consideration if these goods were permitted entry at the rate fixed in the French agreement; and the consignment was dutiable as assessed under paragraph 292, tariff act of 1897.—Bertram v. Robertson (122 U. S., 116) and Whitney v. Robertson (124 U. S., 190).

### United States Court of Customs Appeals, April 10, 1911.

TRANSFERRED from United States Circuit Court for Southern District of New York, Abstracts 22091 and 22116 (T. D. 30099).

[Affirmed.]

*Hatch & Clute* (*Edward S. Hatch* and *Walter F. Welch* of counsel) for appellants.

*D. Frank Lloyd*, Assistant Attorney General (*Charles E. McNabb* on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

DE VRIES, Judge, delivered the opinion of the court:

This importation consists of whisky and other spirituous liquors imported by A. D. Shaw & Co. and others, of New York, from England, and entered at that port.

---

[1] Reported in T. D. 31500 (20 Treas. Dec., 718).

The collector assessed duty thereupon at the rate of $2.25 per proof gallon under paragraph 292 of the tariff act of 1897. This importer, with others, protesting against that assessment, claims the merchandise subject to duty at the rate of $1.75 per proof gallon, which is the duty imposed upon like merchandise from France, Germany, and other foreign countries under certain reciprocity treaties with those countries in force at the time of this importation and exchanged under and by virtue of section 3 of the tariff act of 1897.

The essence of the claim is that under the most-favored-nation clause of the convention of commerce and navigation of July 3, 1815, between the United States of America and His Britannic Majesty, which was continued in force for 10 years by Article IV, treaty of 1818, and indefinitely extended by the convention of August 16, 1827, importations from the Kingdom of England are entitled to be entered at the same rate of duty levied upon such merchandise when imported from France and the other countries with whom such treaties have been executed.

Article 2 of the convention to regulate the commerce between the United States and the territories of His Britannic Majesty, dated July 3, 1815, and proclaimed December 22, 1815, is, in its pertinent part, as follows:

ART. 2. No higher or other duties shall be imposed on the importation into the United States of any articles, the growth, produce, or manufacture, of his Brittanic Majesty's territories in Europe, * * * than are or shall be payable on the like articles being the growth, produce, or manufacture, of any other foreign country; * * *

The treaties with France, Germany, and Italy, forming the basis of the importers' claim here, were negotiated and put into effect by the President of the United States under and by virtue of the authority of section 3 of the tariff act of 1897, which in its applicable parts is as follows:

SEC. 3. That for the purpose of equalizing the trade of the United States with foreign countries, and their colonies, producing and exporting to this country the following articles: * * * brandies, or other spirits manufactured or distilled from grain or other materials; * * * ; or any of them, the President be, and he is hereby, authorized, as soon as may be after the passage of this act, and from time to time thereafter, to enter into negotiations with the governments of those countries exporting to the United States the above-mentioned articles, or any of them, with a view to the arrangement of commercial agreements *in which reciprocal and equivalent concessions may be secured* in favor of the products and manufactures of the United States; and whenever the government of any country, or colony, producing and exporting to the United States the above-mentioned articles, or any of them, shall enter into a commercial agreement with the United States, or *make concessions in favor of the products, or manufactures thereof*, which, in the judgment of the President, shall be reciprocal and equivalent, he shall be, and he is hereby, authorized and empowered to suspend, during the time of such agreement or concession, by proclamation to that effect, the imposition and collection of the duties mentioned in this

act, on such article or articles so exported to the United States from such country or colony, and thereupon and thereafter the duties levied, collected, and paid upon such article or articles shall be as follows, namely:

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

Brandies, or other spirits manufactured or distilled from grain or other materials, one dollar and seventy-five cents per proof gallon.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

The constitutionality of a somewhat similar section of the act of 1890 having been assailed was affirmed by the Supreme Court. In that case the court in an elaborate opinion points out the difference between a delegation to the President of a legislative power, wherein *he* is to determine the provisions and terms of a law, and the enactment by Congress of a law, or substitute law, and providing, as in this case, that the President shall, upon the ascertainment of certain facts or upon the consummation of certain things by him or otherwise, determine and proclaim the date when the law in effect shall be suspended, or the substituted law previously enacted by Congress shall take effect. The latter class of legislation, including many laws enacted by Congress from the foundation of the Government, are not inhibited as delegations of legislative authority. Field *v.* Clark (143 U. S., 649).

Typical and substantially identical with all of these so-called reciprocity treaties is that with France of May 28, 1898, duly proclaimed by the President of the United States May 30, 1898, to take effect June 1, 1898. It provided:

Protocol of the reciprocal agreement between the Government of the United States of America and of the French Republic &ast; &ast; &ast;.

The Government of the United States and the Government of France being animated by the same spirit of conciliation and being equally desirous to improve their commercial relations, have concluded the following agreement:

I.

It is agreed on the part of France that during the continuance in force of this agreement the following articles of commerce, the product of the soil or industry of the United States, shall be admitted into France at the minimum rates of duty, to wit, not exceeding the following rates:

[Here follows schedule.]

II.

*It is reciprocally agreed* on the part of the United States in accordance with the provisions of section 3 of the United States tariff act of 1897 that during the continuance in force of this agreement the following articles of commerce, the product of the soil or industry of France, shall be admitted into the United States at rates of duty not exceeding the following, to wit:

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

On brandies, or other spirits manufactured or distilled from grain or other materials, one dollar and seventy-five cents per proof gallon.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

By its terms ("it is reciprocally agreed") the treaty is one of mutual consideration and concession.

The claim of the appellants is that the concession by the United States to the French Republic of the rate of $1.75 per proof gallon upon such merchandise imported from that republic is a special favor within purview of the treaty of July 3, 1815, with His Britannic Majesty, and that the last-named treaty is self-executing and, therefore, under the Constitution of the United States, the law of the land, and per force thereof and the things recited reads into the tariff law of 1897 an exception thereto in favor of the importations of such merchandise from the Kingdom of Great Britain.

Appellants have accordingly protested against the rate of duty assessed by the collector at the port of New York of $2.25 per proof gallon upon these importations. The Board of General Appraisers overruled the protests.

There is no testimony in the record, the facts being admitted, and the objections of the Government, appellee, come in the nature of a demurrer to the sufficiency of the protests, wherein are fully alleged all the material facts. Almost the precise question has been presented to the Supreme Court of the United States and decided. These appellants, however, insist that under the facts alleged in their protest such differences of law and fact exist as entitle them to a decision.

The question presented involves the consideration of the relative import of treaties and statutes.

The relative force and effect of each is defined by Article VI, paragraph 2, of the Constitution of the United States, as follows:

This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding.

The general rule, as laid down by the courts, is that they are bound to give treaties the same effect as the fundamental law of the land as they do the provisions of the laws of Congress. They are denominated "the supreme law of the land." United States *v. The Peggy* (1 Cranch., 103); Strother *v.* Lucas (12 Pet., 410, 439); Foster *v.* Neilson (2 Pet., 253, 314). Where, however, by its terms, a treaty speaks in the nature of an executory promise it is the rule that it is not self-executing, and before it can be given the same force and effect as the law of the land, action by Congress so legislating must be had.

The expression of the highest court in this particular is perhaps more succinctly stated in the case of Foster *v.* Neilson (2 Pet., 27 U. S., 253, 314) by Chief Justice Marshall, as follows:

Our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract—*when either of the parties engages to perform a particular act*—the treaty addresses itself to the political, not the judicial department, and the legislature must execute the contract before it can become a rule for the court.

If, therefore, the most-favored-nation clause of the treaty of 1815 with Great Britain is not self-executing, all questions affecting the enforcement of any alleged rights thereunder are political and for the legislature or executive, and are not the concern of, or within the jurisdiction of, the courts. That question, however, we deem unnecessary of determination here. In this we follow the precedents established by the Supreme Court.

The question first arose in the case of Bertram v. Robertson (122 U. S., 116). Mr. Justice Field delivered the opinion of the court. The commercial treaty between the United States and the Kingdom of Denmark concluded April 26, 1826 (8 Stat., 340), afterwards abrogated but subsequently renewed in all relevant parts on the 12th of January, 1858 (11 Stat., 719), in the first article declared that—

> The contracting parties, desiring to live in peace and harmony with all the other nations of the earth, by means of a policy frank and equally friendly with all, engage, mutually, not to grant any particular favor to other nations in respect of commerce and navigation which shall not immediately become common to the other party, *who shall enjoy the same freely, if the concession were freely made, or upon allowing the same compensation,* if the concession were conditional.

The fourth article declared that—

> No higher or other duties shall be imposed upon the importation into the United States of any article the produce or manufacture of the dominions of His Majesty the King of Denmark, and no higher or other duties shall be imposed upon the importation into the said dominions of any article the produce or manufacture of the United States than are or shall be payable on the like articles being the produce or manufacture of any other foreign country.

The treaty or convention between the King of the Hawaiian Islands and the United States, concluded January 30, 1875, ratified by Congress May 31 following (19 Stat. at Large, 625), in the first article declared that—

> For and in consideration of the rights and privileges granted by His Majesty the King of the Hawaiian Islands, *and as an equivalent therefor,* the United States agree to admit all of the articles named in a specific schedule, the same being the growth, produce, and manufacture of the Hawaiian Islands, into all the ports of the United States free of duty.

Then follows the schedule, which, among other articles, includes brown and all other unrefined sugars and molasses.

The second article declared that—

> *For and in consideration of the rights and privileges granted by the United States of America* in the preceding article, and as an equivalent therefor, the King of the Hawaiian Islands agrees to admit all the articles named in a specified schedule which are the growth, manufacture, or produce of the United States of America into all the ports of the Hawaiian Islands free of duty.

Then follows the schedule mentioned.

The fifth article made further reciprocal concessions upon the part of the Hawaiian King as a part of the considerations moving the treaty.

Accordingly due proclamation was made by both Governments.

Certain merchants doing business in the city of New York thereafter imported a cargo of sugar at that port, and as the same mer-

chandise was the subject of the treaty with the King of the Hawaiian Islands, and therefore admitted under that treaty free of duty into the United States, protested the assessment of duties thereupon by the collector at the port of New York at the rate provided generally under the then existing tariff law, and made claim that per force of the most-favored-nation provisions in the treaty with the King of Denmark they were likewise entitled to have free entry of their similar merchandise.

The Supreme Court of the United States held against the claimants. In part the court said:

Those stipulations, *even if conceded to be self-executing* by the way of a proviso or exception to the general law imposing the duties, do not cover concessions like those made to the Hawaiian Islands for a valuable consideration. * * * But they were not intended to interfere with special arrangements made with other countries founded upon a concession of special privileges. * * *

*Our conclusion is, that the treaty with Denmark does not bind the United States to extend to that country, without compensation, privileges which they have conceded to the Hawaiian Islands in exchange for valuable concessions.*

It is claimed by the appellants here, however, that the provisions of the Danish treaty calling for the same concessions if similar concessions were made by the Kingdom of Denmark which had been made by the King of Hawaii to the United States expressly committed by *contractual force* the Danish Government to compensation before they could demand of this Government the privileges granted the King of the Hawaiian Islands; and that the situation here is different, being more akin to that the subject of consideration by the Supreme Court of the United States in the case of Whitney *v.* Robertson (124 U. S., 190), wherein there was in effect no contractual estoppel, that clause, italicized, *supra*, not appearing in the treaty with the King of Great Britain.

That case arose out of the importation from Santo Domingo into the United States of "centrifugal and molasses sugars."

The basis of the claim by the importers was also the same reciprocal treaty made with the King of the Hawaiian Islands and the subject of consideration in the Bartram case. The treaty with Santo Domingo, however, differed from that between the United States and the Danish King and was in the pertinent provisions almost identical in terms with the treaty of 1815 with His Britannic Majesty.

The ninth article of the treaty with the Dominican Republic was as follows:

No higher or other duty shall be imposed on the importation into the United States of any article the growth, produce, or manufacture of the Dominican Republic, or of her fisheries; and no higher or other duty shall be imposed on the importation into the Dominican Republic of any article the growth, produce, or manufacture of the United States, or their fisheries, that are or shall be payable on the like articles the growth, produce, or manufacture of any other foreign country, or its fisheries. (15 Stat., 473–478.)

Counsel for the importers in that case made in part the same claim here asserted, that the omission in the treaty with the Republic of Santo Domingo of an express stipulation as to free concessions and conces-

sions upon compensation entitled them to a decision, and maintained that that omission precluded any concession in respect to commerce and navigation by our Government to another country without that concession being *ipso facto* extended to Santo Domingo.

The Supreme Court, however, held that the difference in the treaty stipulations was without significance, and speaking of the Danish treaty, which is substantially identical with that of the British convention here under consideration, said:

> It was never designed to prevent special concessions, upon sufficient considerations, touching the importations of specific articles into the country of the other.

The court then proceeded to pronounce what it deemed another clearly insuperable objection to the pretensions of the appellants. It stated:

> * * * There is another and complete answer to the pretensions of the plaintiffs. The act of Congress under which the duties were collected authorized their exaction. It is of general application, making no exception in favor of goods of any country. *It was passed after the treaty with the Dominican Republic,* and if there be any conflict between the stipulations of the treaty and the requirements of the law, the latter must control. A treaty is primarily a contract between two or more independent nations, and is so regarded by writers on public law. For the infraction of its provisions a remedy must be sought by the injured party through reclamations upon the other. When the stipulations are not self-executing they can only be enforced pursuant to legislation to carry them into effect, and such legislation is as much subject to modification and repeal by Congress as legislation upon any other subject. If the treaty contains stipulations which are self-executing—that is, require no legislation to make them operative—to that extent they have the force and effect of a legislative enactment. Congress may modify such provisions so far as they bind the United States, or supersede them all together. By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but if the two are inconsistent the one last in date will control the other, provided, always, the stipulation of the treaty on the subject is self-executing. If the country with which the treaty is made is dissatisfied with the action of the legislative department, it may present its complaint to the executive head of the Government and take such other measures as it may deem essential for the protection of its interests. The courts can afford no redress.

In other words, the court held · that if the Dominican treaty was self-executing, the tariff act, having been passed later, amended the treaty, and being the latest expression of law was controlling if the two were inconsistent. If the treaty were not self-executing and Congress had passed no legislation carrying the same into effect, in that event the act of Congress would control, even though enacted prior to the signing and promulgation of the treaty. In such cases redress or reclamation could only be had by addressing itself to the executive head of the Government. In other words, the remedy would be political. So that the court concluded that, admitting that the tariff act was in contravention with the terms of the Danish treaty, and particularly the most-favored-nation clause therein, hav-

ing been passed later, it either superseded as law the Danish treaty, if the same were self-executing, or, if it were not self-executing, the remedy was political.

Counsel for the appellant here insists that because the court in the Whitney case rested the decision upon these two grounds the former was *obiter* and the latter the decision of the court. We think a careful reading of the decision of the court will show that both are laid as equally positive objections to the claims of the plaintiff there; that is to say, the court held, first, that the reciprocity treaty with the King of the Hawaiian Islands, being made for a consideration and based upon mutual concessions, was in no sense a violation of or contrary to the stipulations of the most-favored-nation clause of the Danish treaty; and, secondly, if it were a violation of the Danish treaty, the remedies would be purely political and therefore not the subject of judicial cognizance.

The treaty with his Britannic Majesty of July 3, 1815, was the subject of legislation by Congress upon the exchange of signatures. Being presented to the Senate for confirmation by the President in the Fourteenth Congress, the House of Representatives took the position that without legislation by both branches of the Congress the treaty would be without validity, as without it would be self-executing only. After much interchange between the Senate and House, finally on March 1, 1816, an act was agreed upon by the two Houses and was passed and the treaty was enacted a law.

The question, therefore, is presented in this case for the consideration of this court whether or not section 3 of the tariff act of 1897 was in conflict with the most-favored-nation clause of the treaty of 1815 with His Britannic Majesty. We think not.

Section 3 of the tariff act of 1897 was a general law; its attitude toward every nation was uniform. It offered no special favor to France, or Germany, or Italy, or any other country. Every foreign nation was treated alike by the terms of the law. It was equally within the opportunity of England to negotiate a reciprocity treaty as it was within the opportunity of France. The act itself in this particular was but a uniform authorization, means to effect the purpose, that was executed in the Danish Treaty, the subject of consideration in the Bartram case. The two high contracting parties had by signed treaty in that case effected no more than what Congress had authorized with every nation by section 3 of the act of 1897. If, therefore, as held in the Bartram case, that which was executed did not amount to any infraction of the most-favored-nation clauses in treaties with other sovereignties, it can not be said that that which authorized no more and no less could amount to such an infraction.

Moreover, we think that in logic or effect the negotiation of a treaty upon a consideration does no violence to that treaty provision with His Britannic Majesty. The reciprocity treaty with France is one founded upon mutual considerations. This country gave considerations for the considerations given in exchange therefor by France. If,

therefore, this country should concede to Great Britain *without* consideration what it has conceded to France *for* consideration, it would not be conceding to England a favor it conceded to the other country, but it would be conceding to England more than it conceded to the other country, because England in such case gives no consideration for the concession for which France gave a consideration.

The extension of the $1.75 rate upon spirituous liquors in this case to England without any mutual concession therefrom would be conceding not what was conceded France, but something more than that which was conceded France, and, therefore, can not be within purview of the most-favored-nation clause of the treaty with His Britannic Majesty without consideration, which has not been given.

We think the Bartram and Whitney cases, cited and quoted, *supra*, conclusive of this case. If the convention of 1815 with His Britannic Majesty in the particulars considered was *per se* executing, or was by the legislation stated executed, it does not contemplate, and is not contravened by, treaties based upon mutual considerations such as the reciprocal convention of May 28, 1898, with the Republic of France. If the treaty with His Britannic Majesty is not self-executing, or if it has not been executed by the legislation of Congress noted, the question is not one for the courts, but is a political one for the legislative and executive departments of the Government.

*Affirmed.*

MONTGOMERY, Presiding Judge, and HUNT, SMITH, and BARBER, Judges, concur.