AMERICAN EXPRESS CO. *et al.* v. UNITED STATES (No. 894).   BERTUCH & CO. *et al.* v. UNITED STATES (No. 895).[1]

Free importation is claimed for certain chemical wood pulp and sulphide wood pulp from Norway, Russia, Austria-Hungary, and Germany. The claim is made on the ground that by virtue of the favored-nation clause in existing treaties, when that clause is construed in connection with section 2 (wood-pulp section) of the act of July 26, 1911, entitled "An act to promote reciprocal trade relations with the Dominion of Canada and for other purposes," the merchandise appears as entitled to free entry.

It was conceded at the hearing that Canada is a nation for treaty purposes; that there is nothing in the language of the several treaties in question with the several countries to call for any distinctions to be made between the countries represented in the protest; and it was further conceded that said section 2 of the act of 1911 is operative, though Canada refused to avail itself of the option to establish reciprocity as to any other possible importations provided for in other sections of the act.

1. TREATIES AND THE COURTS.

  By the Constitution a treaty is binding as a law of the land, and since it is the function of the courts to construe and apply the law, it becomes a court's duty whenever conditions arise, making a treaty applicable, to declare the force and effect of that treaty.—Foster v. Neilson, 27 U. S. (2 Pet.), 253.

2. SAME.

  Courts may not seek to enforce a treaty which is executory in its character, for legislation is needed to give effect to executory provisions; but courts will as to a self-executing provision in a treaty enforce this whenever the occasion and conditions arise that attach the self-executing provision to existing facts.—Taylor v. Morton (2 Curtis, 453); Bartram v. Robertson (122 U. S., 116); Whitney v. Robertson (124 U. S., 190).

3. A SELF-EXECUTING AGREEMENT.

  The provision of the favored-nation clause is, "if either party shall hereafter grant to any other nation any particular favor in navigation or commerce, it shall immediately become common to the other party." This provision is self-executing, for the privilege could not "immediately become common" to the other party to the agreement if it depended upon some future act by another or upon legislation to make the provision effective.

[1] Reported in T. D. 33434 (24 Treas, Dec., 724).

4. SECTION 2, ACT OF JULY 26, 1911.

Section 2 (wood-pulp section) of the act of July 26, 1911, was enacted with a full understanding that under that section there would be a question for determination whether the provisions of existing treaties with favored nations would attach, and whether by the very force of section 2 like commodities from other nations having the favored-nation clause in treaties are to be admitted on the same terms with the given commodities brought in from Canada. It must be recognized that the favored-nation clause has for its field of operation, precisely that of cases where and when the lawful authority has granted a new privilege to some other nation.

5. SAME.—QUESTION OF A CONSIDERATION.

Section 2 is a provision of the act standing by itself. There is nothing contained in it to indicate a consideration passing, nor is there a suggestion of *aliunde* evidence of the existence of a consideration. It stands wholly independent of the reciprocity provision of the act.

## United States Court of Customs Appeals, May 12, 1913.

APPEAL from Board of United States General Appraisers, G. A. 7354 (T. D. 32423) [Reversed.]

*Comstock & Washburn* for appellants.

*William L. Wemple*, Assistant Attorney General, for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

These cases involve the importations of chemical wood pulp and sulphide wood pulp from Norway, Russia, Austria-Hungary, and Germany. Free importation was claimed on the ground that by virtue of the favored-nation clause in subsisting treaties between the United States and the various exporting countries, when construed in connection with section 2 of the act of July 26, 1911, entitled "An act to promote reciprocal trade relations with the Dominion of Canada and for other purposes," free importation was provided for.

The goods were assessed for duty under paragraphs 406 and 409 of the tariff act of 1909. The board overruled the protest, and the importers have appealed to this court.

Many of the questions discussed in the brief of the importers, counsel have been eliminated by concessions made by the Assistant Attorney General in his brief and on argument. It was argued before the board—and the argument found some favor—that Canada was not a nation within the meaning of the favored-nation clause. But it is now assumed by counsel for the Government that Canada is an autonomy with which a treaty was made, and that the court will not pause to inquire as to the municipal government of such autonomy. It is assumed that it is a nation for treaty purposes, and this may well be assumed, as this Government has itself so treated it.

It is also conceded, for the purposes of this case, that the treaties in question, while employing different language, in some of which the language may be construed as being contractual only, and in others taking the form of positive assurance, no distinction on that account should be made between the several countries represented by the

protest, and that for the purposes of this litigation it is admitted that the position of each of these nations is equal to the one having the most advantageous treaty.

It is also conceded that section 2 of the act of 1911 is operative, notwithstanding the fact that Canada refused to avail itself of the option to establish reciprocity as to any other importations as pro- . vided for in other sections of the act.

The case would seem, therefore, to be narrowed down to three questions, the first of which is whether the court may enforce treaty provisions in this form of action, i. e., whether the treaty is a part of the municipal law, binding upon the courts, or whether the enforcement and observance of treaties is in all cases a political question to be left to other departments of government; secondly, whether the treaty in question is, as it relates to the goods imported from a contracting nation, a self-executing provision; and thirdly, if both of these questions are answered in the affirmative whether the provisions of section 2 of the act of July 26, 1911, were adopted upon a consideration moving from Canada to the United States, for admittedly if this agreement admitting to free entry the importations from Canada of wood pulp and paper was upon a special consideration passing from the Canadian Government to the United States, such treaty would constitute no infraction of the favored-nation clause here in controversy.

We summarize the contentions of counsel for the Government upon the first point by quoting from the Government's brief:

In short, to say that our contracts with foreign countries have been kept or fulfilled is a legislative or executive office, not a judicial one. It follows that if a treaty is promissory it is not part of the supreme law. * * *

It has been said numberless times in this and similar cases that favored-nation clauses are "self-executing if the concession granted is voluntary."

But what power decided whether it was intended to receive a consideration for a favor granted?

And after a discussion of the subject it is further stated:

In effect, then, whether a treaty is self-executing or only executory is not a question for the courts; its status is wholly political and for the political department to settle, and whether an act of Congress derogates from a treaty is not a judicial question. The proper political department upon complaint made is charged with the duty of deciding and adjusting the whole matter. As a political question, it makes no difference when representations are made to the State Department whether the treaty claimed to have been violated by us was the one sort or the other. To say our courts had held it not to be violated would hardly be accepted by an aggrieved foreign nation as conclusive of the subject; but, on the contrary, our whole foreign policy would depend upon an adjustment honorable to both parties, no matter what our courts might have said; and with wisdom born of the consciousness of this fact the courts have held it not to be a judicial question.

There is no question that jurisdiction exists in the Board of General Appraisers and on appeal in this court to determine the rate and amount of duty, if any, to be imposed upon all merchandise imported

into the ports of this country. This jurisdiction is subject to no restriction whatever unless the contention of the Government's counsel should be accepted, and unless it should be held that when the law which is invoked consists of a treaty the question presented is no longer a judicial question.

Article VI of the Constitution provides:

This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land: * * *

Unquestionably the duty imposed upon this court of determining the force and effect of the treaty here in question is a delicate one. If, however, a treaty is binding as a law of the land, it would seem to be the duty of any tribunal whose functions consist of construing and applying the law whenever the conditions arise which make such treaty applicable to declare its force and effect. As was said by Chief Justice Marshall in Marbury *v.* Madison (1 Cranch, 137, at 178):

It is, emphatically, the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.

And again, as early as 1829, in the case of Foster *v.* Neilson (2 Pet., 253), the court, having under consideration a treaty between Spain and this Government, in an opinion by Chief Justice Marshall, said:

A treaty is, in its nature, a contract between two nations, not a legislative act. It does not generally effect, of itself, the object to be accomplished, especially so far as its operation is infra-territorial, but is carried into execution by the sovereign power of the respective parties to the instrument. In the United States a different principle is established. Our Constitution declares a treaty to be the law of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the legislature whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract—when either of the parties engages to perform a particular act—the treaty addresses itself to the political not the judicial department, and the legislature must execute the contract before it can become a rule for the court.

The opinion then proceeds to show that the treaty under consideration was not self-executing.

In Story on the Constitution, volume 2, section 1838, it is said:

In regard to treaties, there is equal reason why they should be held, when made, to be the supreme law of the land. It is to be considered that treaties constitute solemn compacts of binding obligation among nations; and unless they are scrupulously obeyed and enforced, no foreign nation would consent to negotiate with us; or, if it did, any want of strict fidelity on our part in the discharge of the treaty stipulations would be visited by reprisals or war. It is therefore indispensable that they should have the obligation and force of a law, that they may be executed by the judicial power and be obeyed like other laws.

So far as we know, the rule as stated so tersely in Foster *v.* Neilson has not been departed from by the Supreme Court.

This court, in Shaw v. United States (1 Ct. Cust. Appls., 426), summarized the rule as follows:

The general rule, as laid down by the courts, is that they are bound to give treaties the same effect as the fundamental law of the land as they do the provisions of the laws of Congress. They are denominated "the supreme law of the land," citing United States v. The Peggy (1 Cranch, 103); Strother v. Lucas (12 Pet., 410, 439); Foster v. Neilson (2 Pet., 253, 314). Where, however, by its terms, a treaty speaks in the nature of an executory promise it is the rule that it is not self-executing, and before it can be given the same force and effect as the law of the land action by Congress so legislating must be had.

In numerous cases, as in Chew Heong v. United States (112 U. S., 536), United States v. Lee Yen Tai (185 U. S., 213), and United States v. Mrs. Gue Lim (176 U. S., 459), the Supreme Court has construed statutes and treaties together when they were claimed to be in conflict, and determined which should prevail, and applied the rule that the purpose to evade by a subsequent legislative enactment the solemn engagements of a treaty should not be imputed to the lawmaking body until and unless it was declared in plain terms.

The Assistant Attorney General cites three cases which are claimed to be decisive of these appeals. We will consider them in their order, first stating, without citing familiar authorities in support of the rule, that in construing a judicial opinion it is to be treated as controlling authority only so far as it deals with the point actually involved in the case.

The first case cited is that of Taylor v. Morton (2 Curtis, 453; 23 Fed. Cases, 784). That case involved an importation of Russian hemp. Under the tariff act of 1842 it was provided that hemp should pay a duty of $40 per ton, except Manila and Bombay hemp, which should pay $25 per ton. The collector demanded $40 per ton on the importation from Russia. The importer protested the payment and brought suit to recover $15 per ton, claiming that the favored nation stipulation of the treaty of 1832 was operative ex proprio vigore, and that Russian hemp was entitled, under such treaty, to as favorable terms as hemp from Manila and Bombay. The opinion was by Mr. Justice Curtis, sitting at the circuit.

The first question discussed in the opinion was stated by the learned justice as follows:

If an act of Congress should levy a duty upon imports, which an existing commercial treaty declares shall not be levied, so that the treaty is in conflict with the act, does the former or the latter give the rule of decision in a judicial tribunal of the United States, in a case to which one rule or the other must be applied?

In discussing this question, the conclusion is reached by irrefragable logic that as under the Constitution laws enacted by Congress and treaties made under the authority of the United States are alike the supreme law of the land, that there is nothing to indicate that the one is paramount to the other, and it follows that where a law is enacted which repeals or abrogates a treaty in whole or in part,

the law being later in point of time, must be the rule which controls judicial action. This rule being determined, it is then said:

Is it a judicial question whether a treaty with a foreign sovereign has been violated by him; whether the consideration of a particular stipulation in a treaty has been voluntarily withdrawn by one party, so that it is no longer obligatory on the other; whether the views and acts of a foreign sovereign, manifested through his representative, have given just occasion to the political departments of our Government to withhold the execution of a promise contained in a treaty, or to act in direct contravention of such promise?

This was negatived, and it was said:

These powers have not been confided by the people to the judiciary, which has no suitable means to exercise them; but to the executive and the legislative departments of our Government. They belong to diplomacy and legislation, and not to the administration of existing laws. And it necessarily follows that if they are denied to Congress and the Executive, in the exercise of their legislative power, they can be found nowhere in our system of Government. On the other hand, if it be admitted that Congress has these powers, it is wholly immaterial to inquire whether they have, by the act in question, departed from the treaty or not; or if they have, whether such departure was accidental or designed, and if the latter, whether the reasons therefor were good or bad. If by the act in question they have not departed from the treaty the plaintiff has no case. If they have, their act is the municipal law of the country, and any complaint, either by the citizen or the foreigner, must be made to those who alone are empowered by the Constitution to judge of its grounds and act as may be suitable and just.

It is obvious that in the use of this language it was implied by the learned justice all the way through that the tariff act of 1842, in fact fixed a duty of $40 per ton on hemp imported from Russia, and that the question which was held to be a political one was whether there was just ground for the enactment by Congress of such a law which in effect discriminated against Russian hemp, and therefore to an extent abrogated the treaty with Russia. We do not construe this language as in any way in conflict with the rule that the courts have the right to enforce the subsisting provisions of a treaty as a part of the law of the land. Indeed much of the discussion, in the opinion of Justice Curtis, would have been wholly foreign to the case had such been the view which he entertained.

The opinion then proceeds to discuss the contention that a construction should be placed upon the treaty which would admit Russian hemp, but finds insuperable objections to such construction, and concludes by holding that the terms of the treaty there under consideration imported a contract, and in effect that the provisions were not self-executing. This is in no way in conflict with Foster *v.* Neilson, *supra.*

The next case cited is Bartram *v.* Robertson (122 U. S., 116). In that case unrefined sugar and molasses, the produce and manufacture of the Isle of St. Croix, a part of the dominions of the King of Denmark, were imported and the tariff duty fixed by general statute was demanded and paid. The plaintiffs claimed that the

goods should have been admitted free of duty under the treaty with Denmark, because like articles, the produce and manufacture of the Hawaiian Islands, were under the treaty with their king, and by the act of Congress of August 5, 1876, admitted free of duty, and brought suit to recover the amount paid. The court proceeded to construe the first article of the treaty with Denmark, by which the parties engaged—

mutually not to grant any particular favor to other nations in respect of commerce and navigation which should not immediately become common to the other party, but should enjoy the same freely, if the concession were freely made, or upon allowing the same compensation, if the concession were conditional—

And the fourth article, which provided that—

no higher or other duties shall be imposed on the importation into the United States of any article, the produce or manufacture of the dominions of his majesty the King of Denmark; and no higher or other duties shall be imposed upon the importation into the said dominions of any article the produce or manufacture of the United States, than are, or shall be, payable on the like articles, being the produce or manufacture of any other foreign country.

The treaty between the King of the Hawaiian Islands and the United States purported to be and was in fact made upon a consideration moving from Hawaii to the United States. The decision of the point involved was as follows:

Those stipulations, even if conceded to be self-executing by the way of a proviso or exception to the general law imposing the duties, do not cover concessions like those made to the Hawaiian Islands for a valuable consideration. They were pledges of the two contracting parties, the United States and the King of Denmark, to each other, that, in the imposition of duties on goods imported into one of the countries which were the produce or manufacture of the other, there should be no discrimination against them in favor of goods of like character imported from any other country. They imposed an obligation upon both countries to avoid hostile legislation in that respect. But they were not intended to interfere with special arrangements with other countries founded upon a concession of special privileges. The stipulations were mutual, for reciprocal advantages. "No higher or other duties" were to be imposed by either upon the goods specified; but if any particular favor should be granted by either to other countries in respect to commerce or navigation, the concession was to become common to the other party upon like consideration; that is, it was to be enjoyed freely if the concession were freely made, or on allowing the same compensation if the concession were conditional.

The conclusion of the opinion is:

The treaty with Denmark does not bind the United States to extend to that country, without compensation, privileges which they have conceded to the Hawaiian Islands in exchange for valuable concessions. On the contrary, the treaty provides that like compensation shall be given for such special favors. When such compensation is made it will be time to consider whether sugar from her dominions shall be admitted free from duty.

Clearly this case does not hold that the question of the force and effect of an existing treaty is a nonjudicial one.

The last case cited is the case of Whitney v. Robertson (124 U. S., 190). In that case there was under consideration a treaty with the Dominican Republic, which was claimed to entitle the importer to free

importation of sugar and molasses under the same treaty with the King of the Hawaiian Islands, that was under consideration in Bartram *v.* Robertson. It was held in that case that following Bartram *v.* Robertson, and referring to the ninth article of the treaty with the Dominican Republic, and stating that it was substantially like the fourth article of the treaty with the King of Denmark—

That it is a pledge of the contracting parties that there shall be no discriminating legislation against the importation of articles which are the growth, produce, or manufacture of their respective countries, in favor of articles of like character, imported from any other country. It has no greater extent. It was never designed to prevent special concessions, upon sufficient considerations, touching the importation of specific articles into the country of the other. It would require the clearest language to justify a conclusion that our Government intended to preclude itself from such engagements with other countries, which might in the future be of the highest importance to its interests.

This is but a declaration of the now well-recognized rule that the favored-nation clauses in various treaties do not prevent reciprocity agreements fixing lower duties or admitting importations free from other countries upon consideration passing from such country to us.

The rule is fully recognized in the opinion that self-executing treaties are a part of the law of the land, and it is said:

If the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, to that extent they have the force and effect of a legislative enactment. Congress may modify such provisions, so far as they bind the United States, or supersede them altogether. By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but if the two are inconsistent, the one last in date will control the other, provided always the stipulation of the treaty on the subject is self-executing.

And after discussing the case of Taylor *v.* Morton, it is further said:

It follows, therefore, that when a law is clear in its provisions, its validity can not be assailed before the courts for want of conformity to stipulations of a previous treaty not already executed. Considerations of that character belong to another department of the Government. The duty of the courts is to construe and give effect to the latest expression of the sovereign will.

We do not read this opinion as affirming that the courts can not in any case construe or give effect to existing treaties, but quite the reverse. The opinion considers a self-executing treaty as a part of the law of the land. It also declares in terms that it is the duty of the court to construe and give effect to the latest expression of the sovereign will. The case does hold, what is conceded by the importers' counsel in the present case, that if the treaty provisions have been repealed by an act of Congress, they are no longer of force, and that the considerations of justice, equity, or policy of such repeal, or whether such action of Congress was had with due regard to the rights of the treaty nation, are not questions with which the courts can deal, and this we fully recognize.

No contention appears to be made in the present case that there has been any direct repeal of the treaties here under consideration, or of any of their provisions. Indeed the concession of counsel for the Government would seem to imply that the treaties are still in full force, the contentions being limited to the points stated at the outset of this opinion. But there is language in Whitney v. Robertson which would seem to imply that an act of Congress which imposes duties upon commodities of all kinds, making no exception in favor of the goods of any country, is to be treated as a repeal of the provisions of the treaty pro tanto. It is said:

The act of Congress under which the duties were collected authorized their exaction. It is of general application, making no exception in favor of goods of any country. It was passed after the treaty with the Dominican Republic, and, if there be any conflict between the stipulations of the treaty and the requirements of the law, the latter must control.

This is a correct statement of the law. But it could hardly have been intended by this language to declare that an enactment of a general law imposing uniform duties upon all imports would have the effect of abrogating treaties such as these here in question, in whole or in part. Such a general enactment is not in itself a departure from the treaty provisions but rather, as it applies alike to all nations, in furtherance of its provisions, establishing as it does a uniform rate among all nations, and is therefore in no sense inconsistent with the treaty. It would seem that there was some confusion in applying the rule, which is correctly stated. The first departure from the treaty provisions by Congress, if any departure was shown, occurred when the treaty with Hawaii was made, and approved by act of Congress. That is to say, there was free entry accorded to importations from Hawaii, and except for the considerations which passed from Hawaii to the United States, that act would have been in conflict with the treaty. The question therefore of the effect of a treaty with Hawaii and whether it operated to give the same rates as those granted to the Dominican Republic, was before the court, and would appear to have been the real question which stood for decision. The court had already determined that the treaty with Hawaii, when construed with the treaty with St. Domingo, did not have the effect of admitting the importations of the latter country free, and as an additional reason stated the rule that if there is any conflict between the stipulations of the treaty and the requirements of the law, the latter must control. But in this case we discover no indication of a purpose on the part of the court to depart from the rule that a treaty is to be treated as a part of the law of the land.

We think it is manifest that in both these cases, Taylor v. Morton and Whitney v. Robertson, the court proceeded upon the view that the purpose of Congress was to fix a different rate of duty upon importations from Bombay in the one case and from the Hawaiian Islands

in the other than that exacted from the nation claiming under the favored-nation clause, and that this intention had been manifested by an enactment later in point of time than the treaty under consideration. As the later law displaced the earlier (the treaty), it is obvious that the courts could not negative the legislative enactment clearly expressed, and that therefore the treaty stipulations could not be controlling.

So in this case, unless it may be said that the enactment by Congress of section 2 of the act of July, 1911, when construed with the existing treaties, legally imported that whatever grant of rights was made by such act should immediately inure to the benefit of the treaty nations, the importers must fail in their contention. As to what constitutes self-executing provisions, see Cooley's Constitutional Limitations (p. 119).

In an article by Justice Day, in 38 Cyc., page 972, it is said:

When a treaty does not require subsequent legislation to render it effective, after ratification it is the law of the land and will be enforced by the courts the same as a Federal legislative act; but where a treaty is incomplete within itself and requires subsequent legislation to render it effective, manifestly it can not be enforced by the courts until such necessary legislation is had; such as, for instance, where an appropriation of money is necessary to carry the treaty into effect, and until Congress makes such an appropriation the treaty is incomplete, for under the constitution money can not be appropriated by the treaty-making power. A treaty is to be regarded in courts of justice as equivalent to an act of Congress whenever it operates of itself without the aid of any legislative provision; but when the terms of the stipulation import a contract, or when either of the parties engages to perform a particular act, the treaty addresses itself to the political and not the judicial department of the Government.

We take it that what is meant by the language quoted is that the treaty must fix a right which, in the state of things existing when it is invoked in the courts, is capable of enforcement by the courts. The right is necessarily one defined in the treaty itself, but the conditions under which the treaty becomes operative may be fixed by subsequent legislative changes.

This is illustrated by the case of United States *v.* Forty-Three Gallons of Whisky (93 U. S., 188). In that case a treaty was concluded between the Red Lake and Pembina bands of Chippewa Indians of the United States on the 3d of October, 1863, and was proclaimed May 5, 1864. This treaty provided, among other things, that—

the laws of the United States now in force or that may hereafter be enacted prohibiting the introduction and sale of spirituous liquors in the Indian Territory shall be in full force and effect throughout the country hereby ceded until otherwise directed by Congress or the President of the United States.

By the act of March 15, 1864, a penalty was imposed upon any person who should introduce or attempt to introduce any spirituous liquor or wine into the Indian country. It was said in the case:

The power to define originally the "Indian country," within which the unlicensed introduction and sale of liquors were prohibited, necessarily includes that of enlarg-

ing the prohibited boundaries whenever, in the opinion of Congress, the interests of Indian intercourse and trade will be best subserved.

It is true Congress has not done this, but the Constitution declares a treaty to be the supreme law of the land; and Chief Justice Marshall, in Foster and Elam *v.* Neilson (2 Pet., 314), has said "that a treaty is to be regarded, in courts of justice, as equivalent to an act of the legislature whenever it operates of itself without the aid of any legislative provision." No legislation is required to put the seventh article in force, and it must become a rule of action if the contracting parties had power to incorporate it in the treaty of 1863. About this there would seem to be no doubt.

It will be noted that this treaty was made operative only when the statute affixed a penalty to an importation of liquors into the Indian country when it was held the treaty at once attached itself to that provision, and the status of the territory ceded by the treaty to the United States was fixed by the treaty, and the subsequent legislation was given force therein. The case is closely analogous to the present if the view be adopted that the provision of the treaty that "if either party shall hereafter grant to any such nation any particular favor in navigation or commerce it shall immediately become common to the other party" is the controlling provision or a provision permissible to be considered in this case.

Upon this subject the opinion of the Attorney General *In re* Norse American Line of Steamers (14 Opinions, 468) is forcefully in point. That opinion construes a treaty provision with Sweden, contained in article 2 of the treaty of 1783, in which the King of Sweden and the United States mutually engage not to grant thereafter any particular favor to other nations in respect to commerce and navigation which should not immediately become common to the other party (8 Stat., 62), and article 8 of the treaty with Sweden and Norway of July 4, 1827 (8 Stat., 350), reading:

The two high contracting parties engage not to impose upon the navigation between their respective territories, in the vessels of either, any tonnage or other duties of any kind or denomination which shall be higher, or other than those which shall be imposed on every other navigation, except that which they have reserved to themselves, respectively, by the sixth article of the present treaty.

By article 4 of the treaty between the United States and Belgium of July 17, 1858, it was stipulated that steam vessels of the United States and Belgium engaged in regular navigation between their respective countries should be exempt from the payment of duties of tonnage, anchorage, buoys, and lighthouses. It was said in the opinion:

From the simple reading of these treaty provisions in the order above set forth, the conclusion is inevitable that whatever favors or exemptions are enjoyed by the regular steam navigation of Belgium plying between that country and the United States are "common" to the like navigation of Sweden and Norway. For "no higher or other duties" can be imposed upon it in the ports of the United States than are imposed on every other navigation. The Departments of State and of the Treasury

concede that the claim of this Norse line of steam vessels to be exempt in the ports of the United States from the payment of duties of tonnage, etc., is just and reasonable, and they are brought to this concession by an examination and review of the treaty provisions above set forth. But if it is just and reasonable, now and in the future, that steam vessels of Sweden and Norway, engaged in regular navigation between those countries and the United States, should be exempt, in the ports of the latter, from the payment of tonnage duties, it has been so at all times in the past, since the ratification of the treaty with Belgium of July 17, 1858. No language can make this plainer than it is upon the face of the treaties.

   *        *        *        *        *        *        *

It results from what has been said that the moneys which have been paid for duties of "tonnage, anchorage, buoys, and lighthouses" by the "Norse American Line" of steamers to the customs officers of the United States have been exacted contrary, therefore, to law.

This opinion is important in two aspects: First, it in effect holds that the general provision providing that any special favor shall immediately become common to the other party is operative, notwithstanding special provisions relating to the particular subject of navigation. Secondly, it holds that the treaty with Belgium was in effect a new law, and that the effect of such new law not in terms relating to the treaty with Sweden has the force of creating a state of facts upon which the treaty with Sweden became operative, and authorized refund of money by the Treasury *without legislative change*. If such is the effect of a treaty with a particular country, which amounts to no more than a new law relating to such country, it would seem that the same rule should be taken as to subsequent legislation; that there can be no distinction between a state of things created by subsequent treaty with another nation and a state of things created by statutory enactment, if such conditions are created as are provided for by the treaty invoked.

It is said that this provision, although present in the treaty with Russia, was not invoked in the case of Taylor *v.* Morton, but that discussion was confined to the first clause, which was held to be promissory. This fact alone would demonstrate that this case is not authority in support of the proposition that the second clause is not self-executing nor that it is not applicable to the case here presented. But this is not all. The reason why the second clause was not invoked is clear. The act under which the tax was laid in terms fixed a duty of $40 per ton on all hemp except manila, suera, and other hemps of India, on which a duty of $25 per ton was laid. There was clearly no room for the operation of either article of the treaty except as a promissory agreement, for Congress had by differentiating the duty between Bombay hemp and Russian hemp left no room for inference that the intent was to fix a like rate on both, and had excluded the legal consequences which would follow upon the establishment of a rate of duty on Bombay hemp in the absence of express language excluding Russian hemp. Indeed, the contention

was made that as Russian hemp was not specially named, the true construction of the act should be—

upon all unmanufactured hemp not hereinafter excepted either expressly or by force of the treaty with Russia the duty is to be $40 per ton and upon those so excepted $25 per ton.

This construction was not allowed. It was said to do violence to the language of the act. What the case decided was that as the act of Congress had laid a duty on Russian hemp of $40 per ton, and as the act was of later date than the treaty, the court was bound by such later enactment.

It has been suggested that article 9 above quoted is not a controlling provision of the favored nation treaty; that article 5, providing against the imposition of higher duties by each contracting nation than are imposed upon those of any other nation or country, exhausts that subject; and that article 9, in providing that if either party shall grant to any other nation any particular favor in navigation or commerce, it shall immediately become common to the other party, can not be held to have reference to importations. But if the treaty be examined, it will be found that the subjects of commerce and navigation are treated of in various paragraphs of the treaty preceding article 9 in question. In fact the first eight articles are devoted to those subjects. If it be said that full treatment of either of these subjects as declaratory of rights excludes such subject from the provisions of article 9, then it follows that article 9 has *nothing whatever to act upon*. It relates to a particular favor in *navigation or commerce* and both subjects are dealt with *equally in the preceding eight articles*. The fair interpretation is therefore that while article 5 declares the right and is promissory in its terms, and provides against legislation which shall impose higher duties upon articles imported from one nation to the other than are imposed upon articles from any other foreign nation, article 9 was designed to provide a remedy or declare a right which attaches not in case of such adverse legislation, but in case conditions shall arise which make room for its operation, namely, when a particular favor, either in navigation or in commerce is granted to some other nation. Whenever this occurs, then article 9 has operation and not before, either as it affects navigation or commerce. That the introduction of commodities from Canada into this country is commerce needs only to be stated to be accepted. It seems clear, therefore, that this article has application in the present case.

The result of the decisions we think is this, that the courts will not enforce a treaty which is executory in its character for the obvious reason that it has not the power to do. so. Legislation must be had to give effect to such executory provisions. The courts, under the constitutional provision that a treaty is like a law of Congress a part

of the law of the land, will, as to a self-executing provision in a treaty, enforce it whenever the occasion and conditions arise which attach the self-executing provision to existing facts. Where it is claimed that a treaty and a subsequent congressional enactment conflict, it is essential, and it has been common for the courts, to construe the treaty with the law to ascertain whether the latter displaces the former, or whether it creates a condition to which the self-executing provisions of the treaty apply.

We proceed to consider whether the provisions of these treaties are self-executing.

Take as an illustration our treaty with Austria-Hungary:

No higher or other duties shall be imposed on the importation into the United States of any article the produce or manufacture of the dominions of Austria; and no higher or other duties shall be imposed on the importation into the dominions of Austria of any article the produce or manufacture of the United States than are or shall be payable on the like article, being the produce or manufacture of any other foreign country. * * *

If either party shall hereafter grant to any other nation any particular favor in navigation or commerce, it shall immediately become common to the other party. * * *

Similar provisions are contained in other treaties, but as it is conceded by the Government in the present case that the position of each of the nations whose products are here in question is equal to that of the one having the most advantageous treaty, we need not set them forth at length.

If this were an agreement between parties, there would be little difficulty in saying that this is a self-executing provision. The grant of any privilege by one party to the contract to a third person would under such language as that employed immediately inure to the benefit of the other party to the contract. We see no reason why the same interpretation should not be placed upon the language of a treaty. The privilege could not immediately become common to the party to this agreement if it depended upon some future act by another or upon further legislation to make the same effective. If legislation were required before it could be given effect, it would be a contradiction of terms to say that the privilege immediately became common to the parties to the treaty. A more inapt term intended to convey a promise of a future legislative grant of a right could hardly have been devised.

This brings us to a consideration of the act of July 26, 1911. The section involved reads as follows:

Pulp of wood mechanically ground; pulp of wood, chemical, bleached, or unbleached; news print paper, and other paper, and paper board, manufactured from mechanical wood pulp or from chemical wood pulp, or of which such pulp is the component material of chief value, colored in the pulp, or not colored, and valued at not more than four cents per pound, not including printed or decorated wall paper, being the products of Canada, when imported therefrom directly into the United States, shall be admitted free of duty, on the condition precedent that no export duty,

export license fee, or other export charge of any kind whatsoever (whether in the form of additional charge or license fee or otherwise), or any prohibition or restriction in any way of the exportation (whether by law, order, regulation, contractual relation, or otherwise, directly or indirectly), shall have been imposed upon such paper, board, or wood pulp, or the wood used in the manufacture of such paper, board, or wood pulp, or the wood pulp used in the manufacture of such paper or board.

Putting aside for a moment the question hereafter to be considered as to whether this section 2 is an agreement based upon consideration, so that within the American doctrine it is not a violation of the favored-nation provision, but treating it as a direct grant of the right to Canada to import freely its wood pulp and print paper, what is its force and effect as affecting the products of other nations having treaties containing the favored-nation clause? Counsel for Government say in their brief:

Neither does the United States as a litigant here claim that the assessment of duty on the importations in question is to be sustained on the ground, other arguments failing, that in any case Congress had the naked power to violate and destroy these treaties by its later act, and that effect must be given to the act of Congress, even though it be accomplished by this momentous and deplorable logic. The congressional transactions at the time of the passage of the act indicate very clearly that Congress had not only no intention of thereby violating or putting an end to these treaties, qua treaties, but rather the contrary. That question was considered in Congress, and also the possible effect of these treaty clauses in making the provisions of section 2 available to the treaty countries was discussed. There was no agreement of opinion among the Members of Congress on the latter proposition and the matter was allowed to rest upon the understanding that the act should pass, the Government to abide by the construction which should later be placed upon it by duly constituted authority.

This is a correct statement of the attitude of Congress as indicated by the debates in the Senate. It would appear that having in mind these provisions Congress proceeded to enact section 2 with a full understanding that the question would arise thereunder whether the provisions of the treaties with favored nations would attach, and whether by the very force of such enactment like commodities from other nations having the favored-nation clause would be admitted on the same terms as they were from Canada. (Record, 62d Cong., 1st sess., vol. 47, No. 29, pp. 2258–2818.)

If we assume, as counsel for Government appears to, that there was no purpose on the part of Congress by the act of July 26 to violate these treaties, it would seem to follow that the self-executing provisions of these treaties would at once be brought into force and that a lawful act of Congress admitting certain products of Canada into this country free of duty would immediately inure to the benefit of the other parties to these treaties. Indeed, it is difficult to know just when such a provision as that contained in this treaty could have operation at all except it be in a case where lawful authority had granted a new privilege to some other nation. It is equally

difficult to know why, when that privilege is so granted, the terms of the treaty do not at once apply in favor of the parties to the treaty. If the treaty be a part of the law of the land, and if there was no purpose on the part of Congress to violate or put an end to the treaty, it would seem very clear that the treaty and the act in question are laws in pari materia and must be so construed. It is undoubtedly true that where a provision is enacted conferring rights upon another nation, on a condition which would require some affirmative act by parties to the treaty before they could bring themselves within its provisions, at least the case should show that such action had been taken before their rights would inure under this favored-nation provision. But if it be assumed that here there is no more than a naked grant of right, and nothing remains under the terms of the treaty to be done by either party to the treaty, it would logically follow that its grant of this privilege to Canada was expected to be followed by the consequences provided for by the treaty, and that the goods of other countries should be admitted on the same terms as are those admitted from Canada. See 14 Opinions Attorneys General, 468; United States *v.* 43 Gallons of Whisky (93 U. S., 188); McEvoy *v.* Wyman (191 Mass., 276); *In re* Scutella's Estate (129 N. Y. Sup., 20).

This brings us to a consideration of the question whether there was consideration for this special grant to Canada of the right of free importation. It is said that the appellants have not shown that this grant to Canada was voluntary and not founded upon sufficient consideration, and it is argued that in international bargains, as well as in private agreements, the existence of consideration is a question of fact always requiring proof for its establishment, whether the whole consideration is recited in the instrument or not. We think the answer to this is that section 2 is a provision standing by itself. There is nothing to indicate any consideration other than that found within its provisions if there be such, and there is no hint or suggestion that there is aliunde evidence of such consideration. This provision is wholly independent of the reciprocity provision of the act. It is an act of Congress, standing by itself. It would be a novel procedure to attempt to show what considerations controlled Congress other than those which appear in its published proceedings.

It is also suggested that it is conceivable that the Government gave Canada concessions contained in section 2 as an inducement to her to introduce and try to pass the reciprocity schedule. But it is sufficient answer to this to say that there is no evidence afforded by the act itself that such was the inducement or that there was in fact any agreement to introduce and try to pass the reciprocity schedule based upon the consideration of the enactment of section 2. Further-

more, such consideration is negatived by the fact that section 2 was made effective at once and independently of either action or attempted action by the Canadian Parliament.

But it is urged that there is in the terms of section 2 itself evidence of a sufficient consideration which brings this case within the rule established by courts and in diplomatic correspondence of the Department of State that where a special privilege is granted to a particular nation upon a peculiar consideration passing from such nation to this Government, an agreement permitting free importation of an article at a lower rate is not in conflict with the favored-nation clause, and illustrations of this have already been pointed out by reference to Whitney v. Robertson and other cases. But were there special concessions exacted of Canada as a condition to free importation of wood pulp and paper which would not apply to other paper of other·countries in like circumstances?

The language of section 2 above quoted is open to two possible constructions: The first is a construction which affixed as a condition to free entry the establishment of free exportation of all wood pulp and pulp wood from all parts of Canada. The second construction is one which attaches the condition to the specific importation and results in admitting free all the products named whenever such product, untaxed, has been produced from wood also untaxed. It is to be noted that the first construction has not been adopted by the Treasury Department. The second has obtained, and without repeating or enlarging upon the reasoning of Judge Martin in the Cliff Paper Company case, it will suffice to say that we are agreed that the construction which has obtained since the enactment of the statute is the correct one.

It follows that a nonprohibited exportation from any nation having the favored-nation clause of an untaxed material of the same kind and character answers all the requirements and should stand upon the same footing as the goods so imported from Canada. It will not do to say that wood pulp and wood are more accessible from Canada than from other countries. The treaties speak in no such language of distinction. They recognize no difference between nations in different quarters of the globe. If any exception or reservation from the language of the treaty is to be made, it must be made by an authority which has power to abrogate the treaty in whole or in part. It does not lie with the courts or with an administrative department to annex or affix conditions to a treaty which is, unless abrogated by a legislative enactment, the supreme law of the land.

The decision of the Board of General Appraisers is *reversed* and the importation admitted free.

SMITH, BARBER, and MARTIN, Judges, concur.

## DISSENTING OPINION.

DE VRIES, Judge: I am unable to agree with the majority opinion. The importations are of chemical wood pulp. The applicable law determinative of the issues presented is written in paragraph 406 of the tariff act of 1909, section 2 of reciprocity act of 1911, and the so-called "favored-nation clauses" of several treaties between the United States and Norway and Sweden, Austria-Hungary, Russia, Germany, Belgium, and Great Britain, all of which, save that of Great Britain, which omits the second clause, are typified by that with Austria-Hungary. These provisions, so far as pertinent, are as follows:

### ACT OF 1909.

406. * * * Chemical wood pulp, unbleached, one-sixth of one cent per pound, dry weight; bleached, one-fourth of one cent per pound, dry weight: * * *.

### ACT OF 1911.

SEC. 2. Pulp of wood mechanically ground; pulp of wood, chemical, bleached, or unbleached; news print paper, and other paper, and paper board, manufactured from mechanical wood pulp or from chemical wood pulp, or of which such pulp is the component material of chief value, colored in the pulp, or not colored, and valued at not more than four cents per pound, not including printed or decorated wall paper, being the products of Canada, when imported therefrom directly into the United States, shall be admitted free of duty, *on the condition precedent* that no export duty, export license fee, or other export charge of any kind whatsoever (whether in the form of additional charge or license fee or otherwise), or any prohibition or restriction in any way of the exportation (whether by law, order, regulation, contractual relation, or otherwise, directly or indirectly), shall have been imposed upon such paper, board, or wood pulp, or the wood used in the manufacture of such paper, board, or wood pulp, or the wood pulp used in the manufacture of such paper or board.

### AUSTRIA-HUNGARY, TREATY OF 1829.

(1) No higher or other duties *shall be* imposed on the importation into the United States of any article the produce or manufacture of the dominions of Austria; and no higher or other duties *shall be* imposed on the importation into the dominions of Austria of any article the produce or manufacture of the United States, *than are or shall be payable on the like article*, being the produce or manufacture of any other foreign country. (Art. V of treaty of 1829.) (Treaties, Conventions, International Acts, Protocols, and Agreements, 1776–1909, 61st Cong., 2d sess., vol. 1, p. 31.)

(2) If either party shall hereafter grant to any other nation *any particular favor in* navigation or commerce, *it shall* immediately *become* common to the other party, freely, where it is freely granted to such other nation, or on yielding *the same compensation,* *when the grant is conditional.* (Art. IX of treaty of 1829, vol. 1, p. 32, *supra*.)

In the due course of commerce and this status the President of the United States on the 9th day of January, 1912, transmitted a message to the House of Representatives, wherein under the Constitution must originate all import duty legislation, advising—

that the Department of State has received formal representations from the Austro-Hungarian and German ambassadors and the Belgian, Danish, Norwegian, and Swedish ministers, in which, without referring to the specific levy of any duty or

charge on articles mentioned in the above resolution, claim is made on the basis of the most-favored nation clauses in their treaties with the United States to the same treatment in regard to the entry of articles mentioned in section 2 of the reciprocity act as is accorded to Canada under that section—

And that— ·

no formal answer has as yet been made by the department to these communications.

The official records of Congress testify that the matter is now being considered by the legislative department of the Government.

The appellants are importers of such merchandise from several foreign nations having essentially similar treaties with this country and claim that by virtue thereof and the said reciprocity act of 1911 the importations are entitled to free entry.

The Board of General Appraisers denied their claim and they appeal.

The Government responds that their claim is not well founded for the reasons (1) that the said treaty provisions are not self-executing, and therefore not within the province of judicial enforcement, and (2) that said section 2 is a reciprocity statute—a statute upon condition—and therefore not within contemplation of the said favored nation clauses.

The majority of the court holds that these treaty provisions are not executory, but self-executing, and that the statute in question is not reciprocal or based upon consideration, but a free grant effective upon approval by the President without condition and within contemplation of the favored nation clauses of said treaties. I am unable to concur in either view.

Certain fundamental legal principles determinative of the general operation and effect of treaties and what are executory and what self-executing articles thereof are accepted as long and irrevocably established. Probably the best epitome of these is by Mr. Justice Day (38 Cyc., 961–982). Of such are the following:

A treaty is *of* the supreme laws of the land. The Constitution, Article VI, provides:

This Constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land. Foster *v*. Neilson (2 Peters, 253); Strother *v*. Lucas (12 Peters, 410–439); *In re* Cooper (143 U. S., 472); Shaw *v*. United States (1 Ct. Cust. Appls., 426; T. D. 31500).

Necessarily deriving the authority for its existence and effect from the Constitution, as said by Mr. Justice Day:

A treaty to be valid must not, of course, be in violation of the Federal Constitution * * * and the courts have no right to annul or disregard any of its provisions unless they violate the Constitution of the United States. 38 Cyc., 968; the Cherokee Tobacco case (11 Wall. (78 U. S.), 616); Clark *v*. Braden (16 How. (57 U. S.), 635).

A treaty may be amended or revoked by an act of Congress in conflict therewith, and likewise vice versa.

A treaty may supersede a prior act of Congress, and an act of Congress may supersede a prior treaty. The Cherokee Tobacco (11 Wall. (78 U. S), 616, 621); Foster *v*. Neilson (2 Peters, 314); Taylor *v*. Morton (2 Curtis, 453 (23 Fed. Cas., 784, No. 13799).)

While there is no provision in the Constitution as to the effect of conflicts between treaties and acts of Congress, they are placed by that instrument upon the same footing, each being declared to be the supreme law of land, so that neither having any inherent superiority over the other. either may supersede the other, and in case of conflict the one which is later in date will control. 38 Cyc., 975; Ribas *v.* United States (194 U. S., 315); Chae Chan Ping *v.* United States (130 U. S., 581); Whitney *v.* Robertson (124 U. S., 190).

Confirmative of the foregoing principles and definitive of the differences between executory and self-executing treaty articles, Mr. Justice Day states:

When a treaty does not require subsequent legislation to render it effective, after ratification it is the law of the land and will be enforced by the courts, the same as a Federal legislative act; but where a treaty is incomplete within itself and requires subsequent legislation to render it effective, manifestly it cannot be enforced by the courts until such necessary legislation is had; such as, for instance, where an appropriation of money is necessary to carry the treaty into effect, and until Congress makes such an appropriation the treaty is incomplete, for under the Constitution money cannot be appropriated by the treaty-making power. A treaty is to be regarded in courts of justice as equivalent to an act of Congress whenever *it operates of itself without the aid of any legislative provision;* but when the terms of the stipulation *import a contract,* or when either of the parties *engages to perform a particular act,* the treaty addresses itself to the political and not the judicial department of the Government. (38 Cyc., 972–973, and numerous authorities therein cited.)

This principle was early succinctly announced by Chief Justice Marshall in Foster *v.* Neilson in substance as by Mr. Justice Day and, as quoted and affirmed by the Supreme Court ever since in almost every similar case.

A treaty is, in its nature, a contract between two nations, not a legislative act. It does not generally effect of itself the object to be accomplished, especially so far as its operation is infraterritorial,. but is carried into execution by the sovereign power of the respective parties to the instrument. In the United States a different principle is established; our Constitution declares a treaty to be the law of the land; it is consequently to be regarded in courts of justice as equivalent to an act of the legislature, *whenever it operates of itself, without the aid of any legislative provision.* But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial, department, and *the legislature must execute the contract before it can become a rule for the court.* Foster *v.* Neilson (2 Peters, 253, 254).

Upon this point the Supreme Court in Head Money cases (112 U. S., 580–598) stated as follows:

A treaty, then, is a law of the land as an act of Congress is, *whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined.* And when such rights are of a nature to be enforced in a court of justice that court *resorts to the treaty for a rule of decision* for the case before it *as it would to a statute.*

Like all fundamental legal principles which have stood the test of a century or more of criticism and application, this rule of difference between executory and self-executing treaties is rested in sound logic and reason.

An executory treaty article is a mere promise relating to the future, usually mutual, between the high contracting parties. It may apply to one or many things. The method of its performance, therefore, can not be fixed by the stipulation. It may be to pay money or to legislate, or otherwise. *Courts* enforce only *laws* prescribing and clearly defining rights and measures of reparation for their breach. An executory treaty article being a mere promise is not a legal codification of rights and such measurements, and there is, therefore, therein neither such, prescribed as a *law* or "rule for the court" of which a court may lay hold and enforce. Such is not such *a law* as is cognizable by the courts but a *promise* the fulfillment of which rests with the political department of the Government. Before such becomes judicially enforceable it must be executed by legislation supplementing the treaty by spreading upon the statute books such *a law*, which is the only law cognizable by the courts, defining the rights and determining and *granting* the assured compensation for the breach of the treaty promise.

A self-executing treaty is one which "operates of itself without the aid of any legislative provision," as a code of the rights and repairments defined thereby, thus becoming *a law* of the land to which the court resorts "for a rule of decision for the case before it as it would to a statute." Foster *v.* Neilson (2 Peters, 253); Head Money cases (112 U. S., 580–598).

Fundamentally, then, since the courts take jurisdiction of such *laws* only, before they can take jurisdiction of a treaty it must be such *a law*, which from the time of Blackstone has been defined as a "rule of action." When a treaty provision is promissory only it is executory, is not such a law, and is not of judicial cognizance; when it *ex proprio vigore* prescribes a "rule of action" it is self-executing, is such a law and cognizable by the courts.

The Chinese exclusion cases, which concerned the rights of citizens and subjects of one nation residing in another, concern examples of treaties *ex proprio vigore* constituting a *law* cognizable by the courts. Of these the Supreme Court in Head Money cases (112 U. S., 580–598) said:

A treaty *is primarily a compact* between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the Governments which are parties to it. If these fail, its infraction becomes *the subject of international negotiations and reclamations,* so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that *with all this the judicial courts have nothing to do and can give no redress.* But a treaty may also contain provisions *which confer certain rights upon the citizens or subjects* of one of the nations residing in the territorial limits of the other, *which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country.* An illustration of this character is found in treaties, which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens.

Bearing in mind these conceded principles, are the favored nation clauses of these treaties executory or self-executing? On this point I am regretfully not in accord with the majority of the court.

The majority opinion holding the treaty articles self-executing lays great stress on the treaty provision "that no particular favor to another nation in respect of navigation or commerce shall be granted * * * *which shall not immediately become common* to the other party," to the treaty. The opinion necessarily resorts to this language in order to uphold the conclusion that these treaties are self-executing. This is a general provision applying to every such subject. The other treaty provision, *supra*, is specific and confined to import duties alone.

In each of the specific (import duty) articles the obligation is not as in the general articles that such duties "shall immediately become common" but that the duties *shall* likewise *be established,* as in the case of Norway and Sweden; or, that "no other duties *shall be imposed*," than "are or *shall be payable*" upon like goods of such other contracting party, as with Austria-Hungary, Russia, Germany, and Great Britain; or, that neither of the parties "*shall* lay" any other or higher duties, as with Belgium.

While, therefore, it may be argued that the general articles define a *status* which upon granting of any favor to a third nation may, under the treaty, immediately attach in favor of the other high contracting party, the second or specific class of articles relating to import duties alone in no case adopts that language, but in every case employs the language of a contract or a promise to do likewise.

Immediately it must occur to the inquiring mind that this uniform distinction observed by our plenipotentiaries was prompted by some substantial and controlling reason. That is true. Our diplomats undoubtedly knew that while ordinarily they could, through the office and functions of a treaty contract, duly executed, bind the United States, this was one subject upon which they could not do so, as it related to our import duties, any binding act to affect which must, under the Constitution, originate in the House of Representatives and take the due course of legislation. So they knew that while this general article might be so framed as to attach to a statute which, while assuming such otherwise possible, would immediately or later be put into effect by virtue of the treaty alone, such could not be done under the Constitution when our import duty laws would be affected, and that any such stipulation would be ineffective as unconstitutional.

It would be amending our import-duty laws contrary to Article I, section 7, of the Constitution without the measure arising in or receiving the approval of the House of Representatives or "Congress."

It is said by Mr. Justice Day (38 Cyc., 970) that courts in construing treaties—

will adopt the same general rules which are applicable in the construction of statutes, contracts, and written instruments generally, and particularly those applicable in the construction of contracts between individuals.

The doctrine is well settled that in construing a treaty—

it should be so construed as to give a reasonable and sensible meaning to all its provisions. (38 Cyc., 970; Collins *v.* O'Neil, 214 U. S., 113; De Geofroy *v.* Riggs, 133 U. S., 258.)

To give both these articles some effect, the specific one, relative to import duties only, which is clearly and entirely within the general provision, must be held controlling and exclusive as to that subject, while the more general article must be held to relate to other subjects matter. Particularly must this be true since the one may be executory, addressed to Congress, and the other self-executing, the subject of judicial cognizance. Any other construction gives the specific provision no effect whatever.

It is said in the majority opinion that the first eight articles of the treaty are devoted to the subjects of commerce and navigation, and—

if it be said that full treatment of either of these subjects as declaratory of rights excludes such subjects from the provisions of Article IX, then it follows that Article IX has nothing whatever to act upon.

This would follow only in case the eight specific articles exhausted the subjects of commerce and navigation. In such case Article IX would likewise have nothing whatever to act upon.

The opinion of the Attorney General *In re* Norse American Line of Steamers (14 Opinions of Attorney General, 468) is deemed important by my colleagues as—

First. It *"in effect" holds* that the general provision providing that any special favor shall immediately become common to the other party is operative, notwithstanding special provisions relating to the particular subject of navigation.

It does not seem that this point was there raised or considered, and certainly it was not other than "in effect" decided. In a later decision, however, it being the last expression of that office thereupon, *In re* Statuary and other Works of Art (17 Opinions of Attorney General, 223), the point of relative specificity of treaty articles was considered and expressly decided holding that in that particular case, at least, a general in the presence of a special treaty provision was inapplicable under the rule *"expressio unius est exclusio alterius."* As to the second point decided in the former opinion, later.

I am not inclined, however, to rest this dissent upon this proposition. Undoubtedly for many years the courts have considered together the two provisions in such cases as this, and while I believe its affirmance is easily without the lines of and consistent with the conclusions in all those cases, its successful controversion, in my opinion, would leave this dissent upon other tenable grounds. It may be said in passing that if the application of this general article is necessary to sustain the majority opinion, the cause of Great Britain, whose treaty has not this provision, must fail. I think, however,

that its absence does not change the relative status of the contending nations, but indicates that Great Britain viewed the construction of such treaty articles as does this dissent. I shall assume for the purpose of further consideration that we are to read both these treaty articles as applicable.

This brings us to the question, Does the treaty provision "shall immediately become common" *ex proprio vigore* define a status, constitute a *"law"* within judicial cognizance and enforcement?

In Foster *v.* Neilson (2 Peters, 253) the Supreme Court considered a provision of a treaty between this country and his Catholic Majesty, the King of Spain, dated *February 22, 1829,* providing that—

all the grants of land *made before the 24 of January, 1818,* * * * *shall be ratified and confirmed* to the persons in possession of the lands * * *.

Chief Justice Marshall, for the court, said:

The article under consideration does not declare that all the grants *made* by his Catholic Majesty, before the 24 day of January, 1818, "shall be valid," * * *. It does not say that those grants "are hereby confirmed." Had such been its language, it would have acted directly on the subject, and would have repealed those acts of Congress which were repugnant to it; but its language is that those grants "shall be ratified and confirmed" * * *. This seems to be the language of contract; and if it is, the ratification and confirmation which are promised must be the act of the legislature. Until such shall be passed, the court is not at liberty to disregard the existing laws on the subject.

The court dismissed the case on the ground that the treaty provision was executory.

Later, in United States *v.* Percheman (7 Peters, 87), it developed that the court in Foster *v.* Neilson acted upon the English duplicate of the treaty, whereas the Spanish duplicate being translated read "shall *remain* ratified and confirmed." The court said:

No violence is done to the language of the treaty by a construction which conforms the English and Spanish to each other. Although the words "shall be ratified and confirmed" *are properly the words of contract, stipulating for some future legislative act;* they are not necessarily sc. They may import that they "shall be ratified and confirmed," *by force of the instrument* itself. When we observe that in the counterpart of the same treaty, executed at the same time by the same parties, they are used in this sense, we think the construction proper, if not unavoidable.

Here the court holds in both cases that standing alone in a treaty the words *"shall be* ratified and confirmed" import a promise and are executory; that by reason of the Spanish version of the treaty they might be read in the sense "shall *remain* ratified and confirmed." This meaning was, as said in Foster *v.* Neilson, equivalent to "those grants are hereby confirmed," which "would have acted directly on the subject."

Reading both decisions in the light of the facts of the record, the construction gave the language a present reference to a subject matter *existing* at the time of the execution of the treaty, *deeds made*

*prior to January, 1818*, to affect which the treaty article was expressly made. If, however, the language was to be given a future reference and applied to something to be confirmed in the future, after execution of the treaty, the court declared it executory.

What is the language of these treaties? It is "*shall* immediately *become* common." They do not speak of nor is it here sought to apply them to a then existing status or law. They speak of the future and promise as to things to be done in the future that they thereupon shall immediately become common. It is an agreement to do something not even ascertained when the treaty was executed and hence necessarily must be the language of a contract or promise according to the opinions of Chief Justice Marshall, *supra*.

Precisely to the point that, the words "shall immediately become common" in the general provision in these treaties, are not self-executing and that the reading of the two clauses together neither results in self-executing stipulations nor changes the obligations of the contracting nations, is Whitney v. Robertson in interpreting Bartram v. Robertson. The treaty provision before the court was essentially the specific provision of these treaties. The treaty in question did not contain the general provision. Counsel urged and the court commented upon the applicability of Bartram v. Robertson (122 U. S., 116), construing a treaty with Denmark wherein both these treaty provisions were invoked and construed by the court. The court, in declaring that the presence or absence of such a general treaty provision did not change the character of an obligation as a "pledge" or "promise," said:

We do not think that the absence of this provision (the general provision containing the words "shall immediately become common") "*changes the obligations of the United States.* The 9th article of the treaty with that republic in the clause quoted is substantially like the 4th article in the treaty with the King of Denmark. And *as we said of the latter*, we may say of the former, that *it is a pledge of the contracting parties* that there shall be no discriminating legislation * * *." Whitney v. Robertson (124 U. S., 190).

Passing from consideration of the words "shall immediately become common" standing alone, let us consider the proper construction of the treaties as a whole. In the ascertainment, whether these treaty articles are executory or self-executing, it would seem that of prime and controlling authority would be a decision upon *one of these precise treaties*, the treaty of 1832 with Russia. In Taylor v. Morton (Fed. Cas., 23, p. 784), subsequently on error affirmed by the Supreme Court (Taylor v. Morton, 67 U. S., 481), opinion by Mr. Justice Curtis of the Supreme Court, sitting in circuit, an opinion repeatedly and always referred to by the Supreme Court in every similar case for the last half century as the leading authority upon executory and self-executing treaties, *the identical treaty with Russia, treaty of 1832, here in question*, which differs in no sense in

the here pertinent parts from that with Austria-Hungary, was the subject of decision. Whether appellants there invoked both the general and specific provisions of the treaty is not made clear. Mr. Justice Curtis, however, having the entire treaty before him, rests his reasoning on the specific provision. Inferentially he did not deem the other applicable or, as later held by the Supreme Court, deemed their import alike. Whitney *v.* Roberston (124 U. S., 190). The decision of the Supreme Court on error, *supra,* affirming Judge Curtis, mentions two articles of the treaty invoked, 6 and 7. As 7 was totally inapplicable, the probabilities are that "7" is a typographical error intended for 11, and that both the general and specific provisions, 6 and 11, quoted, *supra,* were invoked.

Of it Mr. Justice Curtis said:

> The truth is that this clause in the treaty is merely a contract, addressing itself to the legislative power. The distinction between such treaties and those which operate as laws in courts of justice is settled in our jurisprudence. It was clearly pointed out in Foster *v.* Neilson (2 Peters, 27 U. S., 314). * * * Mr. Chief Justice Marshall, delivering the opinion of the court, said: "Our Constitution declares a treaty to be a *law* of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the legislature, *whenever it operates of itself, without the aid of any legislative provision.* But when the terms of the stipulation import a contract, when either of the parties *engages to perform* a particular act, the treaty addresses itself to the political, not to the judicial, department, *and the legislature must execute the contract before it can become a rule for the court.*" After commenting on the language of the article, he proceeds: "*This seems to be the language of contracts, and if it is; the ratification and confirmation which are promised must be the act of the legislature.* Until such act shall be passed the court is not at liberty to disregard the existing laws on the subject." This is the established doctrine under this treaty, as well as under that by which Louisiana was acquired. 8 Stat., 200; see Garcia *v.* Lee (12 Peters, 37 U. S., 519). Its applicability to a stipulation like that now in question is clear. *The contract is to legislate in conformity with a rule therein given. This necessarily addresses itself exclusively to the legislative power. It is a rule of their action, and not of the action of courts of justice.* They alone must determine which construction it shall receive and what cases are or are not within it, in point of fact, unless by law they refer these matters to the judicial department of the Government.

This decision, therefore, one which for sixty years has stood as the leading case on the subject and been cited, quoted, and approved by all courts, *declares one of the very treaties and exact article thereof here in question, which is typical of all the others, treaty of 1832 between the United States and Russia, to be executory and not self-executing.*

The majority opinion differentiates this express and often reaffirmed adjudication by resting the decision upon the character of the act (tariff act of 1842) to which it was sought to be applied. Mr. Justice Curtis did not so rest this point of the decision. The conclusion seems to have been reached upon the language of the treaty alone compared with that of other treaties cited and the construction put upon them by the Supreme Court. And, though this decision has been quoted and approved in numerous decisions by the Supreme Court applying

its doctrine as to executory and self-executing treaties to many other treaties and as referring to a variety of acts and other treaties, it has no where been held or suggested that the opinion was ruled by the character of the act to which it was sought to be applied.

The majority opinion well points out that every decision must be read in the light of the record and points urged upon the court. In the following cases of Bartram v. Robertson and Whitney v. Robertson two points were necessarily involved, urged upon, and considered by the court. First, it was urged that the invoked treaty provisions were executory and not self-executing. Second, that the treaty provisions did not apply to reciprocity acts and treaties. The court held that the articles were executory, but that whether such or self-executing they did not apply to reciprocity acts and treaties.

In Bartram v. Robertson (122 U. S., 116) identical provisions with those here in question, in the treaty between the United States and Denmark of April 26, 1826, January 12, 1858, were construed by the Supreme Court. Both the general and specific articles were invoked. The court announced that even were these provisions self-executing "they did not cover concessions * * * for a valuable consideration."

The court adverts to and rules as to the character of the provisions whether or not executory or self-executing, saying:

They were pledges of the two contracting parties * * * to each other, that in the imposition of duties (legislation), there should be no discrimination against them in favor of goods of like character imported from any other country. They imposed an obligation upon both countries to avoid hostile legislation in that respect.

While the court construed the language of the treaty as promissory, the case undoubtedly went off on the point that the treaty with the King of Hawaii, which Denmark claimed was within these provisions of her treaty with the United States, was upon a consideration and that before Denmark could claim the same benefits she must make like compensation.

In Whitney v. Robertson (124 U. S., 190) the treaty provision before the court was similar to the specific duty provisions of these treaties. Counsel urged and the court commented on the absence of the general favored nation provision. The court said:

We do not think that the absence of this provision changes the obligations of the United States. The 9th article of the treaty with that Republic, in the clause quoted, is substantially like the 4th article in the treaty with the King of Denmark. And as we said of the latter, we may say of the former, that it is a pledge of the contracting parties that there shall be no discriminating legislation, etc.

Here the court considered and held these provisions as their words import, "pledges," "promises," are contractual, executory.

The court then quotes with approval the decision of Justice Curtis, Taylor v. Morton supra, that such treaties were within the legislative and not the judicial cognizance.

The doctrine of what constitutes an executory treaty, and that the alleged violation of any executory treaty stipulation by act of Congress is not for the courts to determine or enforce, is considered in the Chinese Exclusion case (130 U. S., 581–600). In brief, the treaty between China and the United States of 1881 stipulated the right of the United States to enact exclusion legislation as to Chinese laborers but stipulated further that such legislation "may not absolutely prohibit." October 1, 1888, Congress passed an act claimed in that case to be a violation of that treaty promise, in that it was prohibitive in its operation. The court held upon authority of Taylor *v.* Morton, *supra,* that it being determined that Congress had the constitutional power to pass the act, whether or not it violated the treaty *promise* was for the legislature, saying:

But the province of the courts is to pass upon the validity of laws, *not to make them,* and when their validity is established to declare their meaning and apply their provisions.

Of such treaty provisions the syllabus to Taylor *v.* Morton, *supra,* undoubtedly penned by Mr. Justice Curtis, himself, who reported the case, speaks in accord with all the authorities, and is precisely applicable to these treaties, as follows:

A promise in a treaty that the products of one country shall not be subjected to a higher rate of duty than like products imported into the United States from other countries, addresses itself to the political and not to the judicial department of the Government, and the courts cannot try the question whether it has been observed or not.

Standing alone, therefore, or as including both treaty articles within the focus of consideration, I am unable to conclude that they either are within the adjudicated precedents of or meet the well-settled requirements attending self-executing treaties. The amplest "rule of action" or "rule for the court" claimed to be written in either article is the words "shall immediately become common." "Unaided by any legislation," and standing alone, or read with the specific provision, I cannot conclude these words other than a mere promise.

This brings us to the question of what legislation constitutes an execution of an executory treaty article.

After quoting the requirements of executory and self-executing treaties by Justice Day, *supra,* the majority opinion concludes of and defines the latter under the statement of Mr. Justice Day, as follows:

We take it that what is meant by the language quoted is that the treaty must fix a right which, in the state of things existing *when it is invoked in the courts,* is *capable of enforcement by the courts.* The right is one defined in the treaty itself, but the conditions under which the treaty becomes operative *may be fixed by subsequent legislative changes.*

This statement by the majority opinion, if I read it correctly, assumes the question in dispute, that when such a status or legislation

is fixed or had, the treaty operative thereon may or must necessarily be the subject of enforcement *by the courts.* Undoubtedly, legislation before or after the treaty execution may fix or become a status to which a treaty article attaches. But it does not follow that the enforcement of that treaty stipulation rests with the courts, and this is exactly the distinction pointed out by Mr. Chief Justice Marshall in Foster *v.* Neilson and United States *v.* Percheman, *supra.* It was there held that if the treaty language referred to a status (or legislation) existing at the time the treaty was made it was self-executing and for the courts, the status being defined and known, whereas if the treaty article referred to future legislation or a future status thereafter to arise it was executory and for the legisalture. It depended whether or not the language of the treaty was promissory. So while "the conditions under which the treaty becomes operative may be fixed by subsequent legislative changes" is very true, the enforcement of that treaty when operative, which necessarily must be by a treaty article stipulating in the future, does not lie with the courts but the legislature. Why the distinction? Because while the legislature alone can measure and administer a *common* or equal repairment *promised,* which may or may not be the thing granted to another nation in the first instance, the courts can only administer the *identical* thing so granted. If an *existing* status or legislation is the treaty subject nothing remains to be ascertained that was or is not before the pourparlers and there *exists a status or law* to which the treaty attaches.

Pourparlers may well contract that a subject existing, the quantum, the effect and all particulars of which are known and may be weighed by them, shall if granted one nation apply to all others; but it would be little short of folly that they so bind the nation as to every such future grant to a particular nation without reserving in our agencies the right to determine what would in each case be an equal or common grant as to all other nations. And hence international law and diplomacy has ever held that favored-nation clauses, future or promissory in language, are not for the judiciary but for the political departments of the Government.

The distinction, then, does not rest in whether a treaty may attach to an existing or future status, either in breach or performance of the treaty article, but in the tribunal of reclamation. Applied here I think this court can not, assuming section 2 within the treaty promises, enforce those articles, for the one reason that it can not determine what would be a common or equal reparation for each of the different contending nations; but that, and primarily, whether or not the same act applied to them would be "common" treatment can be determined solely by Congress.

Consonant with the last-quoted view of the majority, it is held that upon enactment of section 2 of the reciprocity act it fixed a legislative status to which these treaty provisions immediately attached. It is then said:

Indeed it is difficult to know just when such a provision as that contained in this treaty could have operation at all except it be in a case where lawful authority had granted a new privilege to some other nation.

True. It does so have operation. But neither reparation for breach of favored-nation treaty articles nor their enforced operation lies solely with the courts. Such reclamation and enforced operation are chiefly made through diplomacy. Treaties are "compacts between nations" the contemplated "operation" of which is, when disputed, decided usually and necessarily by diplomacy and not the courts of one of the parties, as the enforcement of their operation is usually judicially extrajurisdictional.

The majority opinion continues:

It is equally difficult to know why, when that privilege is so granted, the terms of the treaty do not at once apply in favor of the parties to the treaty. If the treaty be a part of the law of the land, and if there was no purpose on the part of Congress to violate or put an end to the treaty, it would seem very clear that the treaty and the act in question are laws *in pari materia* and must be so construed.

The answer to this proposition is, assuming that section 2 is immediately operative as the majority opinion holds, that that section and the treaty provisions, *supra,* while the law of the land *in pari materia, are not in this case all of such law in pari materia.*

The act of 1911 is but part of the legislation *in pari materia* within scope of these treaties enacted by Congress since the treaties were exchanged. The court in such cases concededly lays hold of *all* that which is tantamount to municipal law. We look to the statute books. We find there an act of Congress registered in paragraphs 406 and 409 of the act of 1909. Each part is as to Sweden and the other treaty nations an unrepealed law binding upon the courts. Each is, if either part is, in execution of the treaties, or constitute in part each the status of which the treaties lay hold.

The legislation, assuming the act of 1911 unconditional as held by the court, reads in effect:

Chemical wood pulp *imported from Sweden,* one-sixth of one cent per pound; *imported from Canada, free.*

The courts can not enforce one part of an existing law and refuse to enforce another part. The courts must enforce the law as found upon the statute rolls. *If we so do here we must enforce that part of the act literally applicable to Sweden on Swedish imports and that literally applicable to Canada on her imports.* We must enforce the law as we find it.

The legislation may be conceded to be a violation of, or rather within the treaty promise; but it does not follow that where one statute expressly levies one rate of duty against Sweden and the same or another statute another rate of duty against Canada, that *the courts* can enforce the treaty promise to extend the Canadian law to Sweden. That requires a repeal of the law applicable to Sweden and an addition to the express words of the law relating to Canada. It involves a change of the wording of the Federal statutes and the ignoring by the courts of parts of the written law.

These acts of 1909 and 1911 are duly enacted import-duty laws. Their extent is literally and legally defined by the acts themselves. Under the Constitution neither the treaty-making power nor any court but Congress alone is legally empowered to change or modify them.

This equally applies whether it is sought to exercise that right as to the rate of duty or extent or other limitations of the act. The two are essentially the same, and the rule must apply to any variance or departure from the words of Congress.

That right and power is vested by the Constitution solely in Congress. This court must accept them as the law of the land *as written* upon the statute books. To sustain appellants' contention here we must ignore the limiting words "products of Canada" from the act of 1911, and disregard the act of 1909, *pro tanto*. I am of the opinion that this is not a judicial power.

There is another objection confronting appellants. They rest their claim upon section 2 of the reciprocity act of 1911, and the favored-nation treaty provisions, *supra*. Admitting for the purposes of argument that section 2 is within the treaty purview as not being conditional or upon consideration, and other matters permitting, therefore, cognizable by a self-executing treaty article, these treaty provisions can not be held operative upon this statute for the reason that the necessary legislation to so render them has not been had. Appellants invoking jurisdiction of the court ask decree that a certain import duty statute related in language to Canada alone is, by virtue of certain treaty articles, extended to Sweden and other nations. It is admitted, however, by all that these treaty articles by virtue of which appellants claim an extension of import revenue laws amendatory of contrary existing laws *in pari materia*, were made by the treaty-making power of the Government, did not originate in the House of Representatives and have never been approved by the House or "Congress." They seek, perforce of a law which has never been approved by the House and which is not an act of Congress, to effect a purpose to do which the Constitution requires can be done only by a law which must originate in the House of Representatives and must

be an act of Congress.    Article I, sections 7 and 8, Constitution of the United States.

A treaty to be valid must not of course be in violation of the Federal Constitution 38 Cyc., 968; the Cherokee Tobacco case (11 Wall. (78 U. S.), 616); Clark *v.* Braden (16 How. (57 U. S.), 635.)

An illustration is afforded in the statement by Mr. Justice Day of a treaty which requires legislation to carry it into effect by reason of a constitutional requirement that the thing sought to be done must be authorized by an act of Congress—

such as for instance, where an appropriation of money is necessary to carry the treaty into effect, and until Congress makes such an appropriation the treaty is incomplete, for under the Constitution money can not be appropriated by the treaty-making power.

Neither can import revenue legislation be so amended, affected, or effected.

*In re* Norse American Line of Steamers (14 Opinions Attorney General, 468) is in point.    The majority opinion states of this opinion:

It holds that the treaty with Belgium was in effect a new law, and that the effect of such new law not in terms relating to the treaty with Sweden has the force of creating a state of facts upon which the *treaty* with Sweden became operative and authorized refund of money by the Treasury *without legislative change.*

As I read that opinion it holds that the *treaty* with Sweden did not authorize refunds without legislation, but holds that such refunds were authorized by law, sections 3012½ and 3013 of the Revised Statutes, after June 30, 1864, and section 2 act of March 3, 1839 (5 Stats., 348), prior thereto, and that without such acts of "Congress" there was no authority for the payments.    See also Choctaw Indians (13 Opinions Attorney General, 354).    Upon this and the point that the treaty-making power can not usurp the functions of Congress and by a treaty law provide that which the Constitution has confided to Congress alone to enact, the decision of Mr. Justice McLean, sitting in circuit, in Turner *v.* American Baptist Missionary Society (5 McLean, 344; Fed. Cas., 344, No. 14251) seems convincing:

A treaty under the Federal Constitution is declared to be the supreme law of the land.    This, unquestionably, applies to all treaties where the treaty-making power, without the aid of Congress, can carry it into effect.    It is not, however, and can not be the supreme law of the land where the concurrence of Congress is necessary to give it effect.    Until this power is exercised, as where the appropriation of money is required, the treaty is not perfect.    It is not operative, in the sense of the Constitution, as money can not be appropriated by the treaty-making power.    This results from the limitations of our Government.    The action of no department of the Government can be regarded as a law until it shall have all the sanctions required by the Constitution to make it such.    As well might it be contended that an ordinary act of Congress without the signature of the President was a law, as that a treaty which engages to pay a sum of money is in itself a law.    And in such a case the representatives of the people and the States exercise their own judgments in granting or

withholding the money. They act upon their own responsibility and not upon the responsibility of the treaty-making power. It can not bind or control the legislative action in this respect, and every foreign government may be presumed to know that so far as the treaty stipulates to pay money the legislative sanction is required.

It would seem, therefore, that the high contracting parties knowing our plenipotentiaries could not under the Constitution make by treaty any import duty law or amendment thereof, and that such favored nation treaty claims could be constitutionally satisfied by Congress alone, must have known that reclamation thereunder must be addressed to Congress, and we have seen that they now have so addressed Congress under these treaty articles. Any other conclusion lays down a rule of decision that the treaty-making power may make a law affecting our import duties which subject of legislation is vested by the Constitution in Congress alone. As said by Mr. Justice McLean the two laws and the conjoint force thereof being necessary to appellant's claim, it is as requisite that the treaty law be approved by "Congress" as that the other be signed by the President.

The case of United States v. Forty-three Gallons of Whisky (93 U. S., 188) concerned the personal rights of citizens, a subject within the treaty-making power to make a code of rights. (The Chinese Exclusion case, supra.) There was no constitutional objection to that exercise, and the only question decided was whether or not there was power in the United States to treat with its Indian wards. There was no question of the enforcement of a national promise, or whether the treaty was executory or self-executing, but whether a treaty could adopt as part of its terms acts of Congress existing and to be enacted. The court so held, but the act adopted was one in terms applicable to those to whom it applied. There was no other unrepealed statute applicable to them. That law was not like section 2 which was by Congress expressly made inapplicable to Sweden and the other countries in that by its terms it was confined to Canada alone, its counterpart, the act of 1909, an existing unrepealed law, being equally the supreme law of the land and the sole law upon the statute books applying to Sweden and the other countries. See also United States v. Lee Yen Tai (185 U. S., 213).

Moreover, treaties with Indian tribes are not always legally comparable with or subject to the same construction as foreign treaties. Their territory, properties, and persons are within the jurisdiction of all our laws, that of foreigners beyond. See 13 Opinions Attorney General, 354; the Cherokee Tobacco case (78 U. S., 616–620).

2. Assuming for the purposes of argument, as held in the majority opinion of the court, that these treaties are self-executing, and that the act of 1911 is in effect, then, under the decisions cited in that opinion, which are without question, these treaty articles become a

part of the municipal law of the land and a rule of action for the courts. In such cases the accepted rule, *supra*, is:

While there is no provision in the Constitution as to the effect of conflict between treaties and acts of Congress, they are placed by that instrument upon the same footing, each being declared to be the supreme law of the land, so that neither having inherent superiority over the other, either may supersede the other, and *in case of conflict the one which is later in date will control.* (38 Cyc., 975; Ribas *v.* United States, 194 U. S., 315; Chae Chan Ping *v.* United States, 130 U. S., 581; Whitney *v.* Robertson, 124 U. S., 190.)

*If*, therefore, *these treaty provisions are self-executing*, having been exchanged long prior to the legislation expressed by the act of 1909, as amended by the act of 1911, they were the law of the land cognizable by the courts and the latter legislative concept is tantamount to and should be held a repeal of these treaty provisions. Ropes *v.* Clinch (8 Blatch., 304); Fed. Cas., vol. 20, 1171, No. 12041, referred to with approval in and see Head Money cases (112 U. S., 580–598).

If, however, as this dissent maintains, the treaty is not self-executing or operative as to this act, such would not follow.

3. Is section 2 of the reciprocity act of July, 1911, a statute upon condition or for a consideration?

If so, all concede, that the favored-nation clauses of treaties are inapplicable thereto. That doctrine is well settled. Bartram *v.* Robertson (122 U. S., 116); Whitney *v.* Robertson (124 U. S., 190); Shaw *v.* United States (1 Ct. Cust. Appls., 426; T. D. 31500).

In Cliff Paper Company *v.* United States (4 Ct. Cust. Appls., 186; T. D. 33435), decided this day, the majority of the court held that this section amended the act of 1909, was presently operative and applied to the particular importation rather than to all Canada, and that when all export taxes, prohibitions, restrictions, and license fees were removed from such, and the material from which it was made, free entry was granted. Whether we construe the paragraph as applying to the particular importation or all Canada, it seems to me affects the quantum and not the existence of the consideration, and it nevertheless is a statute upon consideration.

Moreover, the Dominion of Canada waives and must under this act suffer restraint from exercising certain of her export tax powers as to the enumerated articles, that the free entry given by this act be enjoyed. Here certainly is a condition and consideration.

And how is it possible to read an act giving free entry to presently dutiable articles "*upon condition precedent*" followed by an enumeration of such that it is *not* upon *some* condition or consideration whatever that enumeration may express?

Finally, all the considerations adduced in both opinions herein are addressed to a discovery of the intention of Congress in this enactment, whether or not it intended this a statute upon condition

or consideration or a free grant of the right of entry of the enumerated articles to Canada. The approved rule is:

The intention of the legislature in enacting a law is *the law itself*, and must be enforced when ascertained, *although it may not be consistent with the letter of the statute*. (Lewis's Sutherland Statutory Construction, sec. 363.)

The sole inquiry here is, Is this, and did Congress intend this, a statute and grant of free entry upon a condition or consideration? How can the affirmative of this inquiry be disputed when Congress in the very language of the law declares that the statute and the grant to Canada therein made is "upon condition precedent"?

As was said by the Court of Errors and Appeals of New Jersey:

When the intention *is expressed* the question is one of verbal construction only, but if the language be not express and some intention must necessarily be imputed, then it must be determined by inference grounded on legal principles * * *. (Lewis's Sutherland Statutory Construction, sec. 364.)

And by other courts the rule was expressed:

And if the legislature has expressed its intention *in the law itself, with certainty*, it is not admissible to depart from that intention on any extraneous consideration or theory of construction. (Lewis's Sutherland Statutory Construction, sec. 365.)

The inquiry being is this a statute upon condition of consideration, we find here that "the intention is expressed" "in the law itself, with certainty," for what language could be more certain of the congressional purpose in this particular than as expressed in the law itself by Congress that this grant of free entry is "upon the condition precedent"? What other "verbal construction" can be put upon that language? It would seem that where Congress has thus expressly declared the intent and character of the act, constructive rules making for a contrary intent are inapplicable.

The long continued, uniform construction put upon similar statutes, by the courts and departments of our Government granting concessions by statute and treaties to foreign nations upon conditions precedent, sometimes expressly and at other times only impliedly, have always been that statutes or treaties conditional or based upon a consideration are not within the favored nation clauses of treaties. The majority opinion concedes this rule but denies its applicability here. I think this stature is one upon a consideration, a reciprocity statute within the long continued and uniform practice of our Government. In addition to the considerations and references in Cliff Paper Company *v.* United States, decided herewith, suit 1099, dissenting opinion, the following may be instructive. In doubtful cases such are accepted as determinative of the issues. Robertson *v.* Downing (127 U. S., 607).

An early illustration of the application of this doctrine is found with reference to the act of March 3, 1815. That act provided:

*Be it enacted by the Senate and the House of Representatives of the United States of America in Congress assembled,* That so much of the several acts imposing duties on the tonnage of ships and vessels, and on goods, wares, and merchandise, imported into the United States, as imposes a discriminating duty of tonnage, between foreign

vessels and vessels of the United States, and between goods imported into the United States in foreign vessels and vessels of the United States, bc, and the same are hereby repealed, so far as the same respects the produce or manufacture of the nation to which such foreign ships or vessels may belong. Such repeal to take effect in favor of any foreign nation, whenever the President of the United States shall be satisfied that the discriminating or countervailing duties of such foreign nation, so far as they operate to the disadvantage of the United States, have been abolished.

Thus the treaty of April 30, 1803, for the cession of Louisiana, provided, in Article VIII, that "the ships of France shall be treated upon the footing of the most-favored nations" in the ports of the ceded territory. Great Britain took advantage of this offer of reciprocity and removed her discriminating duties against American shipping. France, however, took no action, with the result that French vessels continued to pay discriminating duties when entering United States ports, while British vessels were exempt. The French minister, in a note to the Department of State, under date of December 15, 1817, claimed that the exemption granted to British shipping should likewise be extended to French shipping by virtue of Article VIII of the treaty of 1803.

Secretary of State John Quincy Adams, in his reply of December 23, 1817 (American State Papers, For. Rel., V, 152–153), defined the position of the United States as follows:

The undersigned is instructed to say that the vessels of France are treated, in the ports of Louisiana, upon the footing of the most-favored nation, and that neither the English nor any other foreign nation enjoys any *gratuitous* advantage there which is not equally enjoyed by France. But English vessels, by virtue of a *conditional* compact, are admitted into the ports of the United States, including those of Louisiana, upon payment of the same duties as the vessels of the United States. The condition upon which they enjoy this advantage is that the vessels of the United States shall be admitted into the ports of Great Britain upon payment of the same duties as are there paid by British vessels.

The eighth article of the treaty of cession stipulates that the ships of France shall be treated upon the footing of the most-favored nations in the ports of the ceded territory; but it does not say, and can not be understood to mean, that France should enjoy as *a free gift* that which is conceded to other nations for a full equivalent.

It is obvious that if French vessels should be admitted into the ports of Louisiana upon the payment of the same duties as the vessels of the United States, they would be treated, not upon the footing of the most-favored nation, according to the article in question, but upon a footing more favored than any other nation; since other nations, with the exception of England, pay higher tonnage duties, and the exemption of English vessels is not a free gift, but a purchase at a fair and equal price.

It is true that the terms of the eighth article are positive and unconditional; but it will readily be perceived that the condition, though not expressed in the article, is inherent in the advantage claimed under it. If British vessels enjoyed, in the ports of Louisiana, any gratuitous favor, undoubtedly French vessels would, by the terms of the article, be entitled to the same.

In a subsequent note, dated March 29, 1821 (American State Papers, For. Rel., v, 163–165), Secretary Adams reiterated this position, as follows:

It is no exception * * * that the vessels of England, Prussia, the Netherlands, and the Hanseatic cities pay in the ports of this Union, including those of Louisiana, no other or higher duties than the vessels of the United States. *This is not a favor,*

*but a bargain.* It was offered to all nations by an act of Congress of March 3, 1815. Its only condition was reciprocity. It was always, and yet is, in the power of France to secure this advantage to her vessels. * * * Great Britain, Prussia, the Netherlands, the Hanseatic cities accepted the proffer and granted the equivalent. Had France seen fit also to accept it, the American Government would have hailed the acceptance not as a favor but as equal justice. They were far from anticipating that, instead of this, France would found, upon equal reciprocity, offered to all mankind, a claim to special privileges never granted to any. *Special, indeed, would be the favor which should yield to a claim of free gift to one, of that which had been sold at a fair price to another.*

* * * What implication could be more violent and unnatural than, by a stipulation to treat the ships of France on the footing of those of the most-favored nation in the ports of Louisiana, the United States had disabled themselves forever from purchasing a commercial advantage from any other nation without granting it particularly to France?

Continuing, Secretary Adams, in answer to the claim advanced by the French minister *that on account of the omission of the equivalence clause from Article VIII of* the treaty in question, the benefits must be extended to France immediately and unconditionally, said:

If, from the uniform use of the explanatory clause in all the preceding treaties, stated in the note as a fact, its omission in the Louisiana treaty could have warranted the inference that no such qualification was intended by it, with much stronger reason may it be concluded that, as the parties had before repeatedly contracted the same engagements, at one time with and at another time without the explanatory clause, but always intending the same thing, this variety in the modes of expression was considered by them as altogether immaterial, and that, whether expressed or not, no claims to a favor enjoyed by others could justly be advanced by virtue of any such stipulation without granting the same equivalent with which the advantage had been purchased.

President Monroe, in his annual message to Congress on December 3, 1821 (Richardson, vol. 2, 100–101), in relation to this same case, said, in part, as follows:

By the eighth article of the treaty referred to it is stipulated that after the expiration of twelve years, during which time it was provided by the seventh or preceding article that the vessels of France and Spain should be admitted into the ports of the ceded territory without paying higher duties on merchandise or tonnage on the vessels than such as were paid by citizens of the United States, the ships of France should forever afterwards be placed on the footing of the most-favored nation. By the obvious construction of this article it is presumed that it was intended that no favor should be granted to any power in those ports to which France should not be forthwith entitled, nor should any accommodation be allowed to another power on conditions to which she would not also be entitled on the same conditions. Under this construction no favor or accommodation could be granted to any power to the prejudice of France. By allowing the equivalent allowed by those powers she would always stand in those ports on the footing of the most-favored nation. But if this article should be so construed as that France should enjoy, of right, and without paying the equivalent, all the advantages of such conditions as might be allowed to other powers in return for important concessions made by them, then the whole character of the stipulation would be changed. She would not be placed on the footing of the most-favored nation, but on a footing held by no other nation. She would enjoy all advantages allowed to them in consideration of like advantages allowed to us, free from every and any condition whatever.

Referring to the same question, Mr. Gallatin, United States Minister to France, wrote to the Viscount de Chateaubriand, February 27, 1823 (American State Papers, For. Rel., V, 673):

The United States contend that the right to be treated upon the footing of the most-favored nation, when not otherwise defined, and when expressed only in those words, is that, and can only be that, of being entitled to that treatment gratuitously, if such nation enjoys it gratuitously, and on paying the same equivalent, if it has been granted in consideration of an equivalent.

Secretaries Clay and Van Buren adhered to the same interpretation of Article VIII as had been placed upon it by their predecessor in the Department of State.

Secretary of State Clay, in an instruction to Mr. Poinsett, American Minister to Mexico, while a commercial treaty was under consideration between the United States and Mexico, wrote, March 25, 1825, as follows (American State Papers, For. Rel., VI, 578):

The rule of the most-favored nation may not be, and scarcely ever is, equal in its operation between two contracting parties. It could only be equal if the measure of voluntary concession by each of them to the most-favored third power were precisely the same; but as that rarely happens, by referring the citizens of two contracting powers to such a rule the fair competition between them, which ought always to be a primary object, is not secured, but, on the contrary, those who belong to the nation which has shown the least liberality to other nations are enabled to engross almost the entire commerce and navigation carried on between the two contracting powers. * * * *In order to ascertain the quantum of favor which, being granted.to the commerce and navigation of one nation, is claimed by another, in virtue of a treaty stipulation and embracing that principle, it is necessary that the claimant should be accurately informed of the actual state of the commercial relations between the nations on which the claim of equal favor is preferred and all the rest of the commercial world.* A knowledge of those relations must be sometimes sought after in numerous treaties, statutes, orders, decrees, and other regulations, and is often of very difficult attainment. When acquired, it is not always very easy to distinguish between what was a voluntary grant and that which was a concession by one party for an equivalent yielded by the other. Sometimes the equivalent for the alleged favor proceeding from the one party may be diffused throughout all the stipulations in the treaty by the other, and is to be extracted only after a careful view and comparison of the whole of them. Not infrequently the equivalent may not even be clearly deducible from the instrument itself conveying the supposed favor. Peculiar considerations may lead to the grant of what, on a first impression, might be conceived to be a voluntary favor, but which has really been founded upon a received equivalent; and these considerations may sometimes apply to the entire commerce and navigation of a country, and at others to particular ports only.

In the year 1831 Congress passed an act (sec. 2, chap. 98, Stats., 1831) which read:

SEC. 2. *And be it further enacted,* That from and after the first day of April next the same and no higher tonnage duties and customhouse charges of any kind shall be levied and collected on any British colonial raft, flat, boat, or vessel entering otherwise than by sea at any port of the United States on the rivers and lakes of our northern, northeastern, and northwestern frontiers than may be levied and collected on any raft, flat, boat, or vessel entering otherwise than by sea at any of the ports of the British possessions on our northern, northeastern, and northwestern

frontiers; and that from and after the first day of April next no higher, discriminating duty shall be levied or collected on merchandise imported into the United States in the ports aforesaid, and otherwise than by sea, than may be levied and collected on merchandise when imported in like manner otherwise than by sea into the British possessions on our northern, northeastern, and northwestern frontiers from the United States.

In 1854, during the negotiations between the Governments of the United States and Great Britain which resulted in our reciprocity treaty of 1854 with Canada, Mr. Crampton, the British chargé d'affaires at Washington, under instructions from his Government, wrote to Secretary of State Clayton, and cited this act as a statute upon condition and consideration, as follows:

It has been objected that if certain agricultural articles (more particularly wheat), the productions of Canada, were to be admitted free of duty into the United States, under a convention with the British Government for a reciprocal free trade between that Province and the United States in such productions, the like productions of other nations having "reciprocity treaties" of commerce with the United States must be admitted on the same terms.

To this it may be replied that no nation could claim for itself an advantage under a convention between Great Britain and the United States, which Great Britain herself had not obtained under that convention. Had any other nation a colony similarly situated, she might then be borne out in claiming that such colony should be equally favored; otherwise not.

A precedent has already been established which involves this principle, and makes a distinction between an inland colony and an independent state. * * * In the year 1831 the United States passed "an act to regulate foreign trade on the northeast and northwest boundary" (chap. 98, Mar., 1831), remitting all fees on British vessels entering their ports on that boundary; consequently, up to the present moment, no fees are exacted there on either side, whereas they still exist in the Atlantic ports on all foreign vessels. (House Ex. Doc. 64, 31st Cong., 1st sess.)

This statement was in form not unlike section 2, and was by all nations treated as upon consideration and not, therefore, within contemplation of the most-favored-nation articles of treaties.

The tariff act of 1894, paragraph 608, provided:

608. Salt in bulk, and salt in bags, sacks, barrels, or other packages, but the coverings shall pay the same rate of duty as if imported separately: *Provided*, That if salt is imported from any country whether independent or a dependency which imposes a duty upon salt exported from the United States, then there shall be levied, paid, and collected upon such salt the rate of duty existing prior to the passage of this act.

Notwithstanding that American salt was dutiable on importation into Germany, the German Government demanded free entry of German salt into the United States by virtue of the most-favored-nation clauses (Articles V and IX) of the treaty of 1828 between the United States and Prussia. The question having been submitted to Attorney General Olney, he gave an exhaustive opinion, under date of November 13, 1894 (21 Op., 80–83), from which the following extracts are taken:

The "most-favored-nation clauses" of our treaties with foreign powers have from the foundation of our Government been invariably construed both as not forbidding

any internal regulations necessary for the protection of our home industries, and as permitting commercial concessions to a country which are not gratuitous, but are in return for equivalent concessions, and to which no other country is entitled except upon rendering the same equivalents. Thus, Mr. Jefferson, when Secretary of State in 1792, said of treaties exchanging the rights of the most-favored nation that "they leave each party free to make what internal regulations they please, and to give what preference they find expedient to native merchants, vessels, and productions." In 1817, Mr. John Quincy Adams, acting in the same official capacity, took the ground that the "most-favored-nation clause only covered gratuitous favors and did not touch concessions for equivalents expressed or implied." Mr. Clay, Mr. Livingston, Mr. Evarts, and Mr. Bayard, when at the head of the Department of State, have each given official expression to the same view. It has also received the sanction of the Supreme Court in more than one well-considered decision.

The denial of the German claim here was expressly rested upon the ground that this paragraph granted free entry only upon a consideration. That consideration, be it noted, was as to some nations the abstaining from the levy of any duty upon salt imported from this country, and their waiver of such domestic revenues, and as to others actual repeal of such domestic regulations. In either view the statute upon its face being conditional imported a consideration and hence was not within contemplation of the most-favored-nation articles.

Perhaps the latest diplomatic deliverance relevant to the applicability of the favored-nation clauses of treaties to reciprocal or conditional statutes and treaties is found in the reply of the late Secretary Sherman in 1898, instructing Minister Buchanan at Buenos Aires in regard to the construction placed upon such treaty provisions by the United States as follows:

It is clearly evident that the object sought in all the varying forms of expression is equality of international treatment, protection against the wilful preference of the commercial interests of one nation over another. But the allowance of the same privileges and the same sacrifice of revenue duties to a nation which makes no compensation that has been conceded to another nation for an adequate compensation, instead of maintaining destroys that equality of market privileges which the most-favored-nation clause was intended to secure. It concedes for nothing to one friendly nation what the other gets only for a price. It would thus become the source of international inequality and provoke international hostility.

The neighborhood of nations, their border interests, their differences of climate, soil, and production, their respective capacity for manufacture, their widely different demands for consumption, the magnitude of the reciprocal markets are so many conditions which require special treatment. No general tariff can satisfy such demands. It would require a certainty of language which excludes the possibility of doubt to justify the opinion that the Government of any commercial nation had annuled its natural right to meet these special conditions by compensatory concessions, or held the right only on condition, of extending the same to a nation which had no compensation to offer. The fact that such concessions if made would inevitably inure to the equal benefit of a third competitor would often destroy the motive for, as well as the value of, such reciprocal concessions.

For the foregoing reasons I am of the opinion the decision of the Board of General Appraisers should be affirmed.