WASHINGTON HANDLE CO. *v.* UNITED STATES (No. 4526) [1]

[1] C. A. D. 346.

United States Court of Customs and Patent Appeals, November 4, 1946

*Lawrence, Tuttle & Harper* (*Frank L. Lawrence* of counsel) for appellant.
*Paul P. Rao,* Assistant Attorney General (*Alfred A. Taylor, Jr.,* and *Richard F. Weeks,* special attorneys, of counsel), for the United States.

[Oral argument October 1, 1946, by Mr. Tuttle and Mr. Taylor, Jr.]

Before GARRETT, Presiding Judge, BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The United States Customs Court, First Division (C. D. 936), overruled appellant's protest against the assessment of duty at 20 per centum ad valorem under paragraph 412 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. §1001, par. 412), as amended by the Canadian Trade Agreement, 74 Treas. Dec. 235, T. D. 49752, on several entries of broom handles exported from Canada. The importer claimed the merchandise to be dutiable at 5 per centum ad valorem under paragraph 406 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. §1001, par. 406), as amended by said trade agreement with Canada.

Paragraph 412 of the Tariff Act of 1930, so far as pertinent, reads:

PAR. 412. * * * manufactures of wood or bark, or of which wood or bark is the component material of chief value, not specially provided for, 33⅓ per centum ad valorem.

Paragraph 406 and paragraph 412, as modified by the Canadian Trade Agreement, are as follows:

| Tariff Act of 1930; paragraph | Description of article | Rate of duty |
|---|---|---|
| 406 | Hubs for wheels, heading bolts, stave bolts, last blocks, wagon blocks, oar blocks, heading blocks, *and all like blocks or sticks, roughhewn, or rough shaped, sawed or bored.* [Italics added.] | 5% ad val. |
| 412 | Paintbrush handles; *broom handles* and mop handles, *further advanced than rough shaped, not less than three-fourths of one inch in diameter and not less than thirty-eight inches in length* * * * [Italics added.] | 20% ad val. |

The imported merchandise involved consists of broom handles invoiced as "rough-turned fir sticks," which had been turned in a lathe from square pieces of Douglas fir, cut into specific lengths (42, 48, or 54 inches). The squares were fed into a hopper and conveyed by rollers into a revolving head where knives and cutter blades removed the square corners, making a round handle, as the wood moved from end to end through the machine. After being rounded, the wood continued "down into two ratchet wheels" which held the handle firmly in position permitting a chucking tool to round one end and to drill or bore a hole in the other end.

There are in evidence four samples, Exhibits 1, 2, 3 and 4. Exhibits 1 and 4 do not have the bored holes, as do Exhibits 2 and 3. The latter two exhibits also are smaller in diameter at points about 6 inches from the rounded end than elsewhere.

After the chucking operation all the sticks were then kiln dried under 180 degrees of heat for a period of 48 hours. The record shows that the kiln drying reduces the weight of the article about one-third, which results in a saving of freight charges. The chucking or rounding of the sticks is done before kiln drying since, according to the record, the wood handles are better for this purpose while green than while dry. The kiln drying also places the wood in proper condition to be sanded and lacquered.

As imported, all the handles have the smoothness characteristic of the work of the lathe and in their imported condition could serve well as broom handles unless a more fancy finish was desired.

After the importation is received by the American manufacturer of broom handles they are further smoothed by sanding and are lacquered to give a polished and colored appearance.

The first phase of appellant's contentions to be considered is that the goods respond to the term, "and all like blocks or sticks, rough-

hewn, or rough shaped, sawed or bored," in paragraph 406; that that provision is more specific than the "manufactures of wood" provision from which the Canadian agreement term, "broom handles * * * further advanced than rough shaped, not less than three-fourths of one inch in diameter and not less than thirty-eight inches in length," was drawn; and that since the framers of the trade agreement had no power to remove an article from one dutiable paragraph and place it in another the specificity of the term "broom handles" is not a matter for our consideration.

The importer here concedes that the articles are broom handles, that is to say, the square fir sticks have been advanced to where they have become an article with a single use and a new name; that they are manufactures of wood, but that they are not further advanced than paragraph 406 provides for; that they are rough hewn or rough shaped, sawed or bored, and are sticks *like* the other articles mentioned in the paragraph—hubs for wheels, heading bolts, stave bolts, last blocks, wagon blocks, oar blocks, and heading blocks.

Appellant argues that some of these above-named articles are rough shaped by the lathe, which operation has been held to be a process of rough shaping; that like the blocks and bolts named the instant articles were dedicated to a certain, single use, and that they are not completed broom handles until they have been sanded and lacquered.

We are not impressed with this contention on the part of appellant. The instant articles are not sticks like the articles first named in paragraph 406. The heading bolts, stave bolts and heading blocks are cut up into staves and headings for barrels, etc.—more than one article is made from these blocks and bolts. The hubs for wheels, last blocks, wagon blocks and oar blocks probably are intended to be made only into one article each, but it seems clear from all the facts at hand and from a consideration of the many decisions involving these articles that they, in their imported condition, are merely the very much unfinished raw materials from which later the finished article is made and that they are shipped in that form to avoid shipping much excessive material not needed in the finished article.

Agreeable to the holding of the trial court, we think that the "combined manufacturing operations, prior to importation, have produced something more than rough-shaped sticks." The chucking operation and the kiln drying advance the handles toward their finished state, which is a more finished or advanced condition than the other articles named in paragraph 406. It could be argued that the broom handles were not finished in this country until they were further embellished by settings or metallic trimmings. The instant importations are finished broom handles, ready to attach to a broom unless it is desired to have a more fancily finished handle.

When paragraph 406 was enacted, unquestionably it was the purpose of Congress to give a preferred rate to certain classes of blocks and sticks which had been rough shaped but in the finishing of which there was considerable further labor to be done in this country. It is the usual policy of Congress to encourage the employment of domestic labor in finishing articles which have been imported free of duty or at a low rate of duty. If the broom handles involved here were to take the classification urged by the importer it is obvious that the congressional purpose would be thwarted. The kiln drying, under certain circumstances, might be regarded as a process indulged only for the purpose of eliminating weight and might not be a very material consideration in determining the state of advancement. In the instant case, however, the kiln drying was regarded as essential to precede the sanding and lacquering and therefore was an advancement in finishing the articles into more attractive broom handles. So it would seem that the kiln drying was not alone a step necessary in the preparation for shipment.

Appellant has argued for the applicability and controlling effect of certain language involved in this court's holding in *United States* v. *Pacific Customs Brokerage Co.*, 31 C. C. P. A. (Customs) 102, C. A. D. 256. Involved there were wooden sticks which were held not to be like the blocks and sticks in the first part of paragraph 406, chiefly for the reason that they were not dedicated to the making of a single article. The decision, however, does not hold, and was never intended to hold, that if a wooden block or stick was in fact so advanced by processing as to be dedicated to the making of a single article it would *necessarily* fall within that provision for that reason. There might be other elements of unlikeness, as there are in the instant case.

Upon the instant issue we conclude that the imported merchandise does not respond to the terms of paragraph 406 and is properly dutiable under the provision for "broom handles" as was found by the collector.

The second phase of appellant's contentions, which we will now proceed to consider, involves considerable legislative history which need not be fully stated here. Appellant argues that, in view of long-continued administrative practice and judicial holdings with respect to the applicability of paragraph 406, the term "like" should receive a broad and liberal interpretation. The trial court held that no long-continued administrative practice, within the meaning of that doctrine as accepted by the courts as being persuasive in construing tariff terms, is involved here.

In this court we do not understand appellant as urging the controlling application of the doctrine of long-continued administrative practice, which practice has been held by the courts to be persuasive in

construing doubtful statutory provisions. *Rossman* v. *United States*, 1 Ct. Cust. Appls. 280, T. D. 31321 *Furida, Inc.* v. *United States*, 22 C. C. P. A. (Customs) 321, T. D. 47361.

Long-continued administrative practice in the construction of tariff terms, when followed by subsequent legislation making no change in such terms, is a very persuasive and often a controlling factor. Administrative practice without subsequent legislation, although a matter of consideration for the courts in close cases, is seldom a controlling consideration. *P. Silverman & Son* v. *United States*, 32 C. C. P. A. (Customs) 99, C. A. D. 292.

We have carefully considered the decisions and administrative rulings referred to by both parties to this action and we find nothing therein contained, or in the legislative history of the pertinent statutory provision, that would suggest a holding contrary to that hereinbefore made.

The contention of appellant with respect to long-continued administrative practice, as we understand it, is based upon the theory that there was, between October 1939, and October 1941, an "established and uniform practice" in the classification of the instant merchandise as shown by the instant record; that in the Colombian Trade Agreement, 69 Treas. Dec. 661, T. D. 48258, which became effective May 20, 1936, it was in substance provided that where there was "an established and uniform practice" no administrative ruling changing the agreed rate of duty would be effective retroactively or prior to the expiration of 30 days after the date of publication of notice of such ruling in the usual official manner and that, by virtue of the generalization clause in the trade agreement law, the instant merchandise cannot be charged with an increase over the 5 per centum rate provided in the Canadian Trade Agreement until 30 days has elapsed from the time official notice has been properly promulgated and that, in the instant case, there has been no official notice promulgated.

In 1938, Congress, in the Customs Administrative Act, Section 6 (19 U. S. C. 1940 ed. § 1315), provided:

* * * No administrative ruling resulting in the imposition of a higher rate of duty or charge than *the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice* shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall not apply with respect to the imposition of antidumping duties. [Italics added.]

The importer argues that during the period between October 1939 and October 1941, at two subports in the Seattle district, Sumas and Blaine, there arose an established and uniform practice of assessing duty on merchandise like that at bar at 5 per centum. The record shows quite an effort on the part of the importer to prove that no

other merchandise of this character was imported into the United States except that which was received by it and that therefore there was uniformity in the practice of assessing the same at 5 per centum. Whether appellant has proven this satisfactorily we do not need to consider in view of our conclusion.

The Government argues, we think properly, that no such uniform practice has been established by the instant record. The testimony shows that when goods like that at bar began to enter this country in the fall of 1939 there was considerable uncertainty as to its proper classification, and during this period, or at the latter end of it, the liquidations were held up pending an investigation and determination of the proper classification of the merchandise involved. The matter was submitted to the Bureau of Customs and the practice of liquidating at 5 per centum was interrupted. The Bureau's instruction in January 1942, was to assess the merchandise at 20 per centum. The instant entries were liquidated in 1942. The Bureau's instructions to the collectors were not published in TREASURY DECISIONS, it being stated by the Bureau "that there had not been a uniform practice throughout the United States," which, of course, if true, obviated the necessity of the publication of notice and 30 days' waiting period provided for in the Customs Administrative Act from which we have quoted, *supra.*

In the Customs Administrative Act it will be noted that notice and the 30 days' waiting period are not required unless it is found by the Secretary of the Treasury that "an established and uniform practice" is affected by the change. The Secretary of the Treasury found that there was no such practice. If this matter was entrusted to the Secretary by Congress, it is no concern of ours. But in view of the contentions of the importer, we think it proper to say that 28 shipments of the instant imported materials at two subports, under the circumstances herein recited, cannot properly be held to constitute "an established and uniform practice" in respects with which we are here concerned.

Appellant argues in effect that the collectors at these subports had in effect established the practice and that therefore it could not be changed except by an act of Congress or by complying with the said provisions of the Customs Administrative Act. We cannot believe that such a situation was ever contemplated by Congress or by the framers of the Colombian Trade Agreement. If 28 shipments establish a uniform practice, a much less number could be held to do the same. If two shipments had been the only shipments arriving in the United States it could also be argued that the levying of a 5 per centum duty on each shipment made the practice uniform. We think it clear that the collectors erred in their original classification

of merchandise such as that involved here and the record shows that there was doubt in the minds of the shippers and the collectors when the importations of this character of merchandise began in 1939. Before the shipments were received the president of the exporting company had such doubts as to the proper classification that he consulted with customs officials about the rate of duty that would be assessed.

Appellant argues at length that the decisions of the two collectors of the Seattle district at the subports above referred to were administrative rulings within the meaning of the Colombian Trade Agreement and that only the Treasury Department could bring about a change of classification, and then only at the expiration of 30 days after the publication of notice of such change. It is too obvious for extended argument that the rulings of two collectors in the same district in 28 shipments have not made such "administrative rulings" by the United States of America as to bring about an established and uniform practice within the meaning of the trade agreement.

But if it were conceded that they were administrative rulings within the meaning of the trade agreement it would be of no consequence here. Congress, two years after this trade agreement went into effect, provided that "no administrative ruling resulting in the imposition of a higher rate of duty or charge than *the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice*, shall be effective, etc." In other words, Congress provided that it was for the Secretary of the Treasury to determine the necessity of giving notice before changing a holding by the collector, and if Congress, as we think it has, entrusted this matter to the Secretary of the Treasury (and the Treasury Department in this instance has found that there was no uniform practice throughout the United States), it supersedes anything in the Colombian Trade Agreement even if it could be held that the framers of that agreement, when the term "established and uniform practice" was used, had in mind rulings by one or more collectors such as is shown by the instant record. A treaty yields to a subsequent act of Congress where there is conflict. *American Express Co. et al.* v. *United States,* 4 Ct. Cust. Appls. 146, T. D. 33434; *Minerva Automobiles, Inc.* v. *United States,* 25 C. C. P. A. (Customs) 324, T. D. 49424; *United States* v. *Rathjen Brothers,* 31 C. C. P. A. (Customs) 70, C. A. D. 250. If this is true of a treaty it obviously is true of a trade agreement like the one under consideration here.

It follows from the foregoing that the trial court properly overruled appellant's protest, and the judgment appealed from is *affirmed.*